# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1927

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| Eriberto Melesio Briones, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: October 19, 2004
Filed:  November 30, 2004

_____

Before MURPHY, HEANEY, and BEAM, Circuit Judges.

_____

MURPHY, Circuit Judge.

Eriberto Briones entered a conditional plea of guilty to conspiracy to distribute methamphetamine.  The district court[1] sentenced Briones to 240 months, and he appeals the partial denial of his motion to suppress incriminating statements.  We affirm.

As Trooper Kenneth Ayers of the Nebraska State Patrol was driving along Interstate 80 on the evening of April 23, 2003, he observed a car pulled to the side of

_____

[1]The Honorable Ronald L. Longstaff, Chief Judge, United States District Court for the District of Southern Iowa.

the road with its hazard lights flashing. Ayers stopped to check on it, and he found Eriberto Briones in the driver seat. There were also three passengers, including Briones' girlfriend Rosa Cisneros. After Briones consented to a search of the car, Ayers discovered two packages of methamphetamine inside the front passenger door.

Ayers arrested all four travelers, arranged for their car to be towed to a garage, and called state drug investigator Jeffrey Shelton to interview them. Ayers did not give the suspects a Miranda warning after the arrests or ask them any questions, but he told them the case would "go federal" due to the quantity of drugs in the car. Ayers drove Briones to the garage where the car was being towed. Briones asked several times during the ride what would happen next and whether he would go to jail. When they arrived at the garage, they met investigator Shelton and he drove Briones to the state patrol office in Kearney, Nebraska.

At the Kearney office Shelton interviewed the four suspects individually, talking to Briones last. Shelton did not give him a Miranda warning before asking some preliminary questions about where Briones and his companions had come from and where they were going. The interview ended quickly, however, because Briones said he knew nothing about the trip and had just been in the wrong place at the wrong time. Shelton returned Briones to the lobby of the patrol office and instructed Ayers and another trooper to transport the four suspects to a detention center in Buffalo County. When Briones saw Rosa Cisneros being led out of the building, he blurted out that she had nothing to do with the drugs for they were his.

The officers made no response to Briones' admission, and Trooper Ayers drove him to the detention center. On the way the two talked about Briones' prior history. He told Ayers that he had carried fifteen to twenty pounds of methamphetamine on flights in the past, and Ayers said he was surprised that there had been only half a pound in the car. Ayers did not give Briones a Miranda warning before or during this conversation.

The day after next Briones initiated contact with law enforcement by asking to speak with officers about his drug activity. Special Agent Thurmond Windham III from the Drug Enforcement Administration (DEA) went to the detention center that afternoon to interview him. Windham began the interview by advising Briones of his Miranda rights, and Briones said he understood those rights and wanted to talk. Briones then gave details about his trips delivering methamphetamine to Marshalltown, Iowa and indicated that he wanted to cooperate with officials. Although Briones entered into a cooperation agreement with the DEA, it subsequently broke down.

Briones later moved to suppress all of the statements he made to officials following his arrest. After an evidentiary hearing, the district court issued an order admitting the statement Briones made in the state patrol lobby, suppressing his statements to Ayers during the drive to the detention center, and admitting his statements to Windham and other DEA agents.

On appeal Briones argues that the district court erred by not suppressing all of the statements. When considering an order denying a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (8th Cir. 2003). We will not affirm if the order is unsupported by substantial evidence, reflects an erroneous view of the applicable law, or leaves us with a firm and definite conviction that in light of the whole record a mistake has been made. Id.

Briones first argues that the statement he made in the state patrol lobby, about his being responsible for the drugs, should be suppressed. Since it is undisputed that Briones was then in custody and had not yet been advised of his rights, the issue is whether that statement resulted from interrogation. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). No question was before Briones at the time, yet he claims that his statement resulted from interrogation because it was prompted by seeing his girlfriend

"paraded" past him during the brief interval between his interview with Shelton and his departure to the detention center.

Interrogation in the Miranda context refers to express questioning and to words or conduct that officers should know is "reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). No question was put to Briones before he volunteered his remark, and he had just refused to answer any questions during his interview with Shelton. At the time Briones blurted out his admission, Shelton's questioning had unambiguously ended. The two had left the interrogation room, and Shelton had told the troopers to transport all the suspects to the detention center. Rosa Cisneros was one of four suspects being moved in and out of a small office, and there is no indication that the officers anticipated that the sight of her would cause Briones to make an incriminating remark. We conclude that the statement in the state patrol lobby "was not the product of either express questioning or its functional equivalent," and it was therefore properly admitted. United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986).

Briones also argues that the court erred in not suppressing the statements he made to law enforcement officers after initiating contact with them on April 25 and then waiving his Miranda rights. He contends that these Miranda warnings were given in the middle of one continuous interrogation and thus did not effectively advise him of his rights. In support of this argument he cites the Supreme Court's decision in Missouri v. Seibert, 124 S. Ct. 2601 (2004), issued after the briefing on his appeal but before oral argument.[2]

---

[2]In his briefing Briones had argued that his postwarning statements should be suppressed as the fruits of coercive custodial interrogation, citing Dickerson v. United States, 530 U.S. 428 (2000). We considered and rejected this type of argument in United States v. Villalba-Alvarado, 345 F.3d 1007 (8th Cir. 2003). In the alternative he argued his statements were inadmissible under Oregon v. Elstad, 470 U.S. 298 (1985), because he had experienced an unbroken "aura of coercion"; the record does

In Seibert, an officer used a deliberate tactic of first questioning a suspect without Miranda warnings, then later giving the warnings and repeating the questions already answered. Id. at 2606. In that case the officer elicited an admission from the suspect after thirty to forty minutes of questions, then took a twenty minute break. After the break, he gave the suspect Miranda warnings and resumed his questioning. When she gave a different answer in the second round of questioning than in the first, the officer brought up her earlier incriminating response and she then made a postwarning admission. Id. The Court determined that under these circumstances the Miranda warnings could not have served their purpose, and it held the postwarning statement inadmissible. Id. at 2613.

The Seibert plurality fashioned a multifactor test for use in deciding whether statements made during continuing interrogations are admissible in light of belated Miranda warnings. Relevant factors to consider are the completeness and detail of the questions and answers in the first round of questioning, the degree to which the content of the rounds overlap, the timing and setting of the questioning, the continuing involvement of particular law enforcement personnel, and the degree to which later questions treated the second round as continuous with the first. Id. at 2612. Justice Kennedy supplied the fifth vote necessary to make a majority, and in his concurring opinion he developed a narrower test.

Because Justice Kennedy relied on grounds narrower than those of the plurality, his opinion is of special significance. See Romano v. Oklahoma, 512 U.S. 1, 9 (1994); Marks v. United States, 430 U.S. 188, 193 (1977). For Justice Kennedy the key question is whether the police conduct was deliberately devised to obtain incriminating statements by circumventing Miranda. Seibert, 124 S. Ct. at 2616. In his view the principles of Oregon v. Elstad, 470 U.S. 298 (1985), control when the police have not deliberately used separate interrogations to elicit incriminating

not support this argument.

-5-

statements through belated Miranda warnings. Under Elstad, statements made after a knowing and voluntary waiver of Miranda rights are admissible unless there were earlier unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will. Id. at 309. If a deliberate strategy was used to avoid Miranda requirements, Elstad does not apply and postwarning statements related to the substance of what was said earlier are inadmissible in the absence of curative measures. Seibert, 124 S. Ct. at 2616.

The first step in Justice Kennedy's analysis is to determine whether a staged interrogation process was used as a deliberate strategy. Here, the first interview with Briones was cut short by his unwillingness to answer Shelton's questions. His incriminating statement in the lobby when he saw Rosa Cisneros was unexpected and did not result from interrogation. Ayers testified that it was not his job to conduct interviews in drug cases, but statements made by Briones on the drive to the detention center were later suppressed by the district court. Approximately a day and a half after his conversation with Ayers, Briones requested an interview with law enforcement officers. The DEA responded, and Windham gave him Miranda warnings at the outset. Briones volunteered to cooperate and spoke freely to the agents. Nothing in the record suggests that these law enforcement officers from different agencies used a deliberate strategy of staged interrogations to circumvent Briones' Fifth Amendment rights.

The question then becomes whether his statements to the DEA agents are admissible under Elstad. There is no dispute that Briones knowingly and voluntarily waived his rights after Windham read him the Miranda warnings. Neither does the record indicate that Briones was coerced into making his earlier statements or that officers made a calculated effort to subvert his free will during those conversations. We conclude that the statements made after Briones received his Miranda warnings are admissible under Elstad because he knowingly and voluntarily waived his Miranda rights and his earlier unwarned statements did not result from coercion or

a calculated effort to undermine his will. The district court's ruling admitting evidence of the statements Briones made after his Miranda warnings thus conforms with Seibert.[3]

Accordingly, we affirm the judgment of the district court.

_____

_____

[3]Briones' statements would also be admissible under the multifactor test fashioned by the Seibert plurality. His statements before and after the Miranda warnings were separated by more than a day, occurred in different settings, and were made to different law enforcement officers representing different agencies. There was also no significant overlap or continuity between his limited conversation with Ayers and the debriefings he had later with DEA agents. See Seibert, 124 S. Ct. at 2612; see also United States v. Hernandez-Hernandez, 384 F.3d 562, 566 (8th Cir. 2004).