**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

TASHIRI WAYNE WILLIAMS,
          *Defendant-Appellant.*

No. 04-50182

D.C. No.
CR-03-00985-
MMM-01

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
May 6, 2005—Pasadena, California

Filed January 30, 2006

Before: James R. Browning, Raymond C. Fisher and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Carlton F. Gunn, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Beong-Soo Kim, Assistant United States Attorney, Criminal Complaints Section, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

FISHER, Circuit Judge:

Tashiri Williams ("Williams") appeals a district court order denying his motion to suppress a written confession that he

gave to United States Diplomatic Security Service ("DSS") agents during interrogation. According to a DSS investigation report, the agents interrogated Williams in two steps — first, they asked him questions until he confessed; then, immediately after his oral confession, they read him his *Miranda* rights and asked him to write down what he had previously told them. The district court suppressed Williams' oral statements because they were elicited in violation of *Miranda*, but admitted his postwarning written confession on the ground that the statement "was voluntarily made." We reverse.

Under the Supreme Court's recent decision in *Missouri v. Seibert*, 542 U.S. 600 (2004), rendered after the district court's ruling, a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning was objectively ineffective. Because the district court did not have the benefit of *Seibert*, it did not determine whether the agents deliberately withheld the *Miranda* warning, and if so, whether the warning finally given effectively apprised Williams that he had a "genuine choice whether to follow up on [his] earlier admission." *Id.* at 616 (Souter, J., plurality opinion). We therefore remand to the district court for further findings consistent with this opinion.

I.

On July 11, 2003, Williams filed a passport application at the United States Passport Office in Los Angeles, California. The application he submitted contained his own identification information, but the photographs he attached were those of his acquaintance, Hussein Iddrissu ("Iddrissu"). A fraud manager noticed the discrepancy and notified DSS agents. Four days later, when Iddrissu arrived at the Passport Office to pick up the completed passport, DSS Special Agents O'Neil and Dobbs stopped him for questioning. During questioning, they requested that Iddrissu call Williams and ask him to come to the office.

Williams and Iddrissu's brother, Hassan, arrived at the government building shortly after it closed, around 6 p.m. According to the investigation report (prepared by Agent Dobbs), the agents met Williams and Hassan at the building entrance, took them into the DSS offices and separated the two men for questioning. The agents escorted Williams into a reception area and began interrogating him.[1] They started by showing Williams his passport application. Williams immediately responded, "[t]hat's not my picture." Agent O'Neil then told Williams that he had a choice: "We can do this the easy way or the hard way. . . . I think we have enough to arrest you now and let the courts figure it out, or you can talk to us and tell us what's going on and, you know, it might be better for you in the long run." Williams complied and told the agents that he and Iddrissu had planned a joint trip to London and taken passport pictures together for the trip. The pictures, Williams explained, must have been inadvertently switched.

Agent O'Neil called Williams' account a "bullshit story" and described to him how criminal charges could affect his professional ambitions. In response, Williams changed his story and admitted to submitting Iddrissu's photograph on the passport application.

After this oral confession, Agent O'Neil read Williams his *Miranda* rights, gave him a waiver of rights form and asked him to write a statement.[2] When Williams asked what he should write, both agents declined to specify, though Agent Dobbs testified that in response to such questions agents generally tell suspects that they should write "what you've told

---

[1] The district court found that Williams was in custody at this point.

[2] Before the district court, the agents testified that they read Williams his rights before asking any questions. This testimony contradicted the investigation report filed by Agent Dobbs immediately after the incident. The district court held an evidentiary hearing on the matter and found that the agents did not issue *Miranda* warnings until after Williams made his inculpatory comments, immediately before he wrote his statement. The government has not appealed this factual finding.

us." Williams wrote: "There is nothing I can say, but I made a mistake. I just tried to get a passport without my picture for someone else. I just don't want this to be on my record."

A federal grand jury indicted Williams on three counts: (1) conspiracy to make a false statement in a passport application in violation of 18 U.S.C. § 371; (2) making a false statement in a passport application in violation of 18 U.S.C. § 1542; and (3) making a false statement within the jurisdiction of the United States in violation of 18 U.S.C. § 1001. Before trial, Williams moved to suppress both his oral and his written statements. The district court granted suppression of the oral confession because "the government [had] not met its burden of showing by a preponderance of the evidence that Williams waived his *Miranda* rights before he made [the] incriminating statements" to the agents. However, the court denied Williams' motion to suppress the written confession because neither his oral statements nor written confession were coerced and his written confession "was voluntarily made." After trial, a jury found Williams guilty of all three felony charges and the district court sentenced him to four years of probation, including six months of home detention.

## II.

The adequacy of a *Miranda* warning and the voluntariness of a suspect's statements are questions of law that are reviewed de novo. *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2002); *United States v. Bautista,* 362 F.3d 584, 589 (9th Cir. 2004). "The admission of statements made in violation of a person's *Miranda* rights is reviewed for harmless error." *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).

## III.

[1] "In order to combat [the pressures inherent in custodial interrogation] and to permit a full opportunity to exercise the

privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A *Miranda* warning functions both to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause. *Id.* at 457-58; *see also Chavez v. Martinez*, 538 U.S. 760, 790 (2003) (Kennedy, J., concurring in part and dissenting in part). Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him. *Miranda*, 384 U.S. at 479. Williams contends that the midinterrogation *Miranda* warning he received did not adequately apprise him of his rights and therefore his written confession should not have been admitted.

## A.

The Supreme Court has twice addressed the admissibility of a confession obtained after a *Miranda* warning but preceeded by the suspect's earlier, *unwarned* incriminating statements. In *Oregon v. Elstad*, 470 U.S. 298, 301 (1985), Elstad, a burglary suspect, made incriminating comments to a police officer at his home without first receiving a *Miranda* warning. Officers then took him to the county sheriff's office, placed him in an interrogation room, read him his *Miranda* rights and questioned him at length. *See id.* During this interrogation, and approximately 30 minutes after making his original inculpatory comments, Elstad expanded significantly on his earlier statements and made a full confession. *Id.* at 301-02.

**[2]** Before the Supreme Court, Elstad argued that his confession should be suppressed as "fruit of the poisonous tree" because, although made after a proper *Miranda* warning, his confession was tainted by the earlier unwarned comments. *Id.* at 303. In a related argument, Elstad asserted that the coercive impact of his unwarned statement — inherent in a defendant's having "let the cat out of the bag" — required suppression

because the statement compromised the voluntariness of his postwarning statement. *Id.* at 302-04. Focusing on the voluntariness of Elstad's unwarned comments, the Court rejected both arguments. *Id.* at 306-14. The Court reasoned that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the postwarning confession. *Id.* at 314. Rather, "[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Id.* at 308. The Court thus held that a "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id* at 318.[3]

As Justice O'Connor explained in her *Seibert* dissent,

---

[3]The Court's belief that Elstad's prewarning statements were voluntary played a decisive role in its analysis. The Court reasoned that in cases where a postwarning confession was preceded by a "clearly voluntary" but unwarned statement, a "careful and thorough" midstream warning "*ordinarily* should suffice to remove the conditions that precluded admission of the earlier statement" because it "conveys the relevant information" regarding a suspect's Fifth Amendment rights. *Elstad*, 470 U.S. at 310-11, 314 (emphasis added). In such circumstances, "the suspect's choice whether to exercise his privilege to remain silent should *ordinarily* be viewed as an act of free will." *Id.* at 311 (emphasis added) (internal quotation marks and internal citations omitted). However, *Elstad* also appeared to limit its holding to the circumstances of the case:

> [i]t is an unwarranted extension of *Miranda* to hold that a *simple failure* to administer the warnings, *unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will*, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn *in these circumstances* solely on whether it is knowingly and voluntarily made."

*Id.* at 309 (emphasis added).

*Elstad* also held that "if [the prewarning] statement is shown to have been *involuntary*, the court must examine whether the taint dissipated through the passing of time or a change in circumstances." *Seibert*, 542 U.S. at 628 (emphasis added).[4] Similarly, *Elstad* requires the court to suppress a postwarning statement if the suspect demonstrates that his statement was involuntary despite the *Miranda* warning. *Elstad*, 470 U.S. at 318 (explaining that "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements"). Thus, under *Elstad*, if the prewarning statement was voluntary (or if involuntary, the change in time and circumstances dissipated the taint), then the postwarning confession is admissible unless it was involuntarily made despite the *Miranda* warning. *See United States v. Wauneka*, 770 F.2d 1434, 1440 (9th Cir. 1985); *accord United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004).[5]

---

[4]As stated in *Elstad*, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." 470 U.S. at 310.

[5]Voluntariness is a totality of circumstances inquiry that assesses "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973) (noting that although "the state of the accused's mind, and the failure of the police to advise the accused of his rights, [are] certainly factors to be evaluated in assessing . . . 'voluntariness,' . . . they [are] not in and of themselves determinative"). The court should therefore "determine[ ] the factual circumstances surrounding the confession, assess[ ] the psychological impact on the accused, and evaluate[ ] the legal significance of how the accused reacted." *Id.* at 226. In the past, for example, the Court considered "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (internal citations omitted). We have similarly stated that voluntariness depends on such factors as "the surrounding circumstances, the combined effect of the entire course of the officer's conduct upon the defendant,

**[3]** We followed *Elstad* in *United States v. Orso*, 266 F.3d 1030 (9th Cir. 2001) (en banc). Orso made inculpatory statements in a patrol car en route to a police station and then, immediately upon arriving at the station, received a *Miranda* warning and confessed. 266 F.3d at 1032-33. Pointing to *Elstad's* disjunctive clause, "[a]bsent deliberately coercive or improper tactics," Orso argued that her postwarning statements should be suppressed because the officers engaged in improper tactics (questioning her during the car ride without giving a *Miranda* warning), which "tainted" her warned confession. *Id.* at 1034-36 (quoting *Elstad*, 470 U.S. at 314). We declined to distinguish *Elstad*. Reasoning that "the overriding theme running through [*Elstad*] is the voluntariness of the unwarned statement," we held that where a suspect's initial, unwarned statements are voluntary, her subsequent, warned statements are admissible regardless of alleged improper police tactics.[6] *Id.* at 1036, 1038. "[T]he most persuasive reading of the 'improper tactics' passage [of *Elstad*]," we explained, "is that the Court simply meant to connect such police conduct to the potential involuntariness of the unwarned statements." *Id*. at 1037. Thus, *Orso* held that where a postwarning statement is voluntarily made, the "warned confession should . . . be suppressed only if [the prewarning statements] were involuntary, and any taint therefrom had not dissipated by the time [the suspect] was read the *Miranda* warnings." *Id*. at 1039.

---

including the effect of his previously having made a confession, and the manner in which the officers utilized this prior confession in obtaining a second confession." *Wauneka*, 770 F.2d at 1440. In addition, the government must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *see also Seibert*, 542 U.S. at 609 n.1.

[6]Because Orso did not argue that her postwarning confession was involuntary, we did not address the voluntariness of the warned statement. *See Orso*, 266 F.3d at 1039 n.4.

### B.

At issue in *Seibert* was the admissibility of a confession obtained by the use of a two-step interrogation strategy, termed "question-first," that called for the deliberate withholding of the *Miranda* warning until the suspect confessed, followed by a *Miranda* warning and a repetition of the confession already given. 542 U.S. at 604, 609-11 (Souter, J., plurality opinion). As the facts in *Seibert* make clear, "[t]he object of [the] question-first [tactic] is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611; *see also Orso*, 266 F.3d at 1043-44 (Paez, J., concurring) (the fact that the interrogating officer deliberately withheld the *Miranda* warning "deprived Orso of information that was indispensable to her exercise of free will").

Like defendants Elstad and Orso, Seibert made incriminating statements both before and after receiving a *Miranda* warning. Officers awakened Seibert, suspected of murdering a teenager in a mobile home fire, at 3 a.m. and drove her to a police station where one officer, who later testified that he was explicitly instructed not to provide a *Miranda* warning at this point, interrogated her for 30 to 40 minutes until she confessed. *Seibert*, 542 U.S. at 604-05. Immediately after Seibert confessed, she was given a 20-minute coffee and cigarette break. *Id.* at 605. Officer Hanrahan then turned on a tape recorder, gave her a *Miranda* warning and resumed questioning:

> Hanrahan: "'Trice, didn't you tell me that he was supposed to die in his sleep?"

> Seibert: "If that would happen, 'cause he was on that new medicine, you know . . ."

> Hanrahan: "The Prozac? And it makes him sleepy. So he was supposed to die in his sleep?"

Seibert: "Yes."

*Id*. As in *Elstad*, the trial court suppressed the prewarning statements but admitted the postwarning confession. *See id.* at 606.

Five Justices of the Supreme Court, however, found *Seibert* distinguishable from *Elstad* even though Seibert's prewarning statements were, like Elstad's, uncoerced and made voluntarily. Justice Souter, joined in a plurality by Justices Stevens, Ginsburg and Breyer, and Justice Kennedy concurring separately, voted to suppress Seibert's self-incriminating statements, despite the fact that she gave them after receiving her *Miranda* warning and ostensibly waiving her rights. *See id.* at 609, 616-17 (Souter, J., plurality opinion) (acknowledging that a *Miranda* warning largely guarantees the admissibility of confessions); *id.* at 618 (Kennedy, J., concurring in the judgment). Contrary to *Elstad*, these Justices acknowledged that some two-step interrogations yield inadmissible statements even in the absence of coercion. They were therefore unwilling to permit interrogators to exploit the mere form of the *Miranda* warning while depriving it of any meaningful substance. As Justice Souter explained, the circumstances of Seibert's interrogation "challeng[ed] the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 617 (Souter, J., plurality opinion). Justice Kennedy agreed, stating that a two-step interrogation technique "designed to circumvent *Miranda*," *id.* at 618, "simply creates too high a risk that postwarning statements will be obtained when a suspect was deprived of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 621 (Kennedy, J., concurring in the judgment) (internal quotation marks omitted).

**[4]** Although five Justices agreed that Seibert's postwarning statement was inadmissible, the case did not produce a

majority opinion. According to the plurality, when interrogators question first and warn later, the threshold inquiry is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611-12. The plurality therefore focused on several objective factors to determine whether the *Miranda* warning given in each case fulfilled the function of advising the suspect that he or she had "a real choice about giving an admissible statement" during the second stage of interrogation. *Id.* at 612.

> The contrast between *Elstad* and [*Seibert*] reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615. The plurality reasoned that the interrogation of Elstad at the police station "present[ed] a markedly different experience" — separate in time, location and tone — from the brief interaction at Elstad's home; as a result, the *Miranda* warning given at the station offered Elstad a "genuine choice whether to follow up on [his] earlier admission." *Id.* at 615-16.

In *Seibert*, by contrast, officers interrogated Seibert at length before giving the *Miranda* warning and gave her only a short break without any change of location after she confessed, and then the same officer from the prewarning interrogation expressly used her unwarned statements to obtain a warned confession. *Id.* at 616. In the plurality's view, these facts "*by any objective measure* reveal[ed] a police strategy adapted to undermine the *Miranda* warnings." *Id.* (emphasis

added).[7] In determining whether the warning was effective, the plurality expressly stated that the "focus is on facts apart from [the interrogator's] intent that show the question-first tactic at work." *Id.* at 616-17 n.6. Because the facts in *Seibert* did not "reasonably support a conclusion that the warnings given could have served their purpose," the plurality held that Seibert's postwarning statements were inadmissible. *Id.* at 617.

Although Justice Kennedy agreed that *Seibert* could be distinguished from *Elstad*, he viewed the plurality's test for admissibility as "cut[ting] too broadly" because the objective inquiry into a midstream *Miranda* warning's effectiveness applied "to every two-stage interrogation." *Id.* at 621-22. At the same time, he recognized that in Seibert's case, the police withheld the *Miranda* warning "to obscure both the practical and legal significance of the admonition when finally given." *Id.* at 620. To avoid undermining *Miranda's* "clarity," Justice Kennedy would also evaluate the effectiveness of a midstream warning using an *objective* inquiry, but only in cases in which the police *deliberately* employed the two-step strategy to undermine *Miranda*:

> If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a *reasonable person in the suspect's situation would understand the*

---

[7]As the plurality explained, "[w]hen the same officer who had conducted the first phase recited the *Miranda* warnings, he . . . did not advise that her prior statement could not be used. . . . The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Seibert*, 542 U.S. at 616-17.

> *import and effect of the* Miranda *warning and of the*
> Miranda *waiver*. For example, a substantial break in
> time and circumstances between the prewarning
> statement and the *Miranda* warning may suffice in
> most circumstances . . . . Alternatively, an additional
> warning that explains the likely inadmissibility of
> the prewarning custodial statement may be suffi-
> cient.

*Id.* at 622 (emphasis added). However, absent a showing that
the law enforcement officers deliberately used the question-
first tactic to lessen the warning's effectiveness, Justice Ken-
nedy would apply *Elstad's* voluntariness standards to deter-
mine whether the postwarning confession is admissible. *Id.* at
622. Because the officers in *Seibert* deliberately employed the
question-first technique and then took no curative measures to
ensure that the midstream warning effectively apprised Sei-
bert of her rights, Justice Kennedy joined the plurality in con-
cluding that Seibert's postwarning statement was
inadmissible. *Id.*[8]

Justice O'Connor, writing for the four dissenting Justices,
disagreed with the majority's conclusion that *Elstad* could be
distinguished, but agreed with the plurality that Justice Ken-
nedy's proposed "intent-based test" should not be applied. *Id.*
at 622-29 (O'Connor, J., dissenting). In addition, the dissent-
ing Justices viewed the objective inquiry into the midstream
warning's effectiveness as "inform[ing] the *psychological*
judgment regarding whether the suspect has been informed
effectively of her right to remain silent." *Id.* at 624. Because
they viewed this inquiry as relying on the theory that the "lin-

---

[8]Justice Breyer also wrote a brief concurrence indicating that he would
instruct courts to exclude the "fruits" of the unwarned questioning unless
the "failure to warn was in good faith." *Seibert*, 542 U.S. at 617 (Breyer,
J., concurring). Although Justice Breyer joined the plurality opinion in
full, he also stated that he agreed with Justice Kennedy's opinion "insofar
as it is consistent with [the application of a] good-faith exception" to an
exclusionary rule. *Id.* at 618.

gering compulsion" of the unwarned statement requires suppression of the postwarning statement — which *Elstad* rejected — the dissenting Justices would have evaluated the two-step interrogation procedure under *Elstad's* voluntariness standards. *Id.* at 627-28.

## C.

**[5]** To determine whether Williams' confession falls within the exception to *Elstad* carved out in *Seibert*, we must first decide how to interpret *Seibert* in light of these splintered opinions. This is a question of first impression in this circuit, although Judge Berzon has provided thoughtful guidance in a recent dissenting opinion. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1138-43 (9th Cir. 2005) (Berzon, J., dissenting).

**[6]** Ordinarily, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation and internal quotation marks omitted). We need not find a legal opinion which a majority joined, but merely "a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree." *Planned Parenthood v. Casey*, 947 F.2d 682, 693 (3d Cir. 1991), *aff'd in part and rev'd in part on other grounds,* 505 U.S. 833 (1992); *see also Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1200 (9th Cir. 2000) (concluding that Justice Powell's analysis in *Bakke* is "the narrowest footing upon which a race-conscious decision making process could stand"); *King v. Palmer*, 950 F.2d 771, 781-82 (D.C. Cir. 1991) (en banc) (explaining that "the narrowest opinion must represent a common denominator of the Court's reasoning").**⁹** To determine whether *Seibert*

---

**⁹**Applying *Marks'* rule, we have often construed one Justice's concurring opinion as representing a logical subset of the plurality's and as

contains a precedential holding, we must identify and apply a test which satisfies the requirements of both Justice Souter's plurality opinion and Justice Kennedy's concurrence.

**[7]** Applying the *Marks* rule to *Seibert*, we hold that a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning — in light of the objective facts and circumstances — did not effectively apprise the suspect of his rights. Although the plurality would consider all two-stage interrogations eligible for a *Seibert* inquiry, Justice Kennedy's opinion narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken *Miranda's* protections. *See Rodriguez-Preciado*, 399 F.3d at 1139 (Berzon, J., dissenting) ("Justice Kennedy concurred in *Seibert* on a ground arguably narrower than that relied upon by the plurality."); *United States v. Kiam*, ___ F.3d ___, 2005 WL 3578853 at *7 (3d Cir. Jan. 3, 2006) (stating that the Third Circuit "applies the *Seibert* plurality opinion as narrowed by Justice Kennedy"); *United States v. Briones*, 390 F.3d 610, 613-14 (8th Cir. 2004) (explaining that the "first step" in Justice Kennedy's "narrower test" is "to determine whether a [two-step] interrogation process was used as a deliberate strategy"); *Stewart*, 388 F.3d at 1090 ("Justice Kennedy thus provided a fifth vote to depart from *Elstad*, but only where the police set out deliberately to withhold *Miranda* warnings until after a confession has been secured."). In other words, both the plurality and Justice Kennedy agree that where law enforcement officers *deliberately* employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warn-

---

adopting a holding that would affect a narrower range of cases than that of the plurality. *See, e.g.*, *United States v. Antelope*, 395 F.3d 1128, 1135-38 (9th Cir. 2005); *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1161 (9th Cir. 2003); *Smith*, 233 F.3d at 1199-1200. Accordingly, we have held such a concurrence binding under *Marks*.

ings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights, the trial court should suppress the confession.[10] This narrower test — that excludes confessions made after a deliberate, objectively ineffective midstream warning — represents *Seibert's* holding. In situations where the two-step strategy was not deliberately employed, *Elstad* continues to govern the admissibility of postwarning statements. *See also United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) ("The admissibility of postwarning statements is governed by *Elstad* unless the deliberate 'question-first' strategy is employed."); *Briones*, 390 F.3d at 614 (applying *Elstad* after determining that law enforcement officers did not use a "deliberate strategy" of two-step interrogation to circumvent *Miranda*); *Stewart*, 388 F.3d at 1090 ("Where the initial violation of *Miranda* was not part of a deliberate strategy to undermine the warnings, *Elstad* appears to have survived *Seibert*.").

## 1. *Determining Deliberateness*

As an initial matter, we note that Justice Kennedy did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy.[11] Justice Kennedy envisioned a deliberateness test that focuses on intent, but as

---

[10]Justices Souter and Kennedy may differ on one aspect of the *Seibert* exception analysis, which is the effectiveness of additional curative warnings. Justice Souter explained that the plurality does not "hold that a formal addendum warning that a previous statement could not be used would be sufficient to change the character of the question-first procedure to the point of rendering an ensuing statement admissible," but that "its absence is clearly a factor." *Seibert*, 542 U.S. at 616 n.7 (Souter, J., plurality opinion). Justice Kennedy suggested that an addendum warning "may be sufficient." *Id.* at 622 (Kennedy, J., concurring in the judgment). Because no curative warnings were given here, we need not determine the Court's holding on this issue.

[11]For example, Justice Kennedy's opinion is silent as to what, if any, presumptions apply or which party bears the burden of proving or disproving deliberateness.

the plurality noted, "the intent of the officer will rarely be as candidly admitted as it was here." *Seibert*, 542 U.S. at 617 n.6 (Souter, J., plurality opinion). Consistent with our sister circuits, we hold that in determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning.[12] *See id.* at 616 (Souter, J., plurality opinion) (concluding that the facts present in *Seibert* "by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings."); *see also Briones*, 390 F.3d at 614 (examining objective evidence in the record to conclude that interrogators did not use a deliberate strategy of two-step interrogations). Such objective evidence would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements. *Id.* at 615 (Souter, J., plurality opinion); *see also id.* at 621 (Kennedy, J., concurring in the judgment) (describing the overlapping content of Seibert's two confessions as evidence of "the temptations for abuse inherent in the two-step technique").[13] By focusing on both "facts apart from intent that

---

[12]This test functions appropriately as a combination of Justice Souter's plurality opinion and Justice Kennedy's concurrence. *See Siegmund v. Gen. Commodities Corp.*, 175 F.2d 952, 953 (9th Cir. 1949) ("The reasons assigned by the two groups of Justices who concurred in the result are . . . applicable . . . .").

[13]For example, in *United States v. Briones*, the Eighth Circuit concluded that the record contained no evidence suggesting that law enforcement officers deliberately delayed the *Miranda* warning to circumvent the suspect's rights. 390 F.3d at 614. The court noted that the suspect did not make an incriminating statement during the first interview as it was cut short by the suspect's unwillingness to answer the officer's questions. *Id.* Instead, the suspect's "unexpected" (and unwarned) inculpatory statement "did not result from interrogation" because it was made in the lobby after the initial questioning had ended. *Id.* Moreover, the suspect's postwarning confession came a day and a half after the initial interview during a meeting with law enforcement officers which the suspect himself requested.

show the question-first tactic at work," *Seibert*, 542 U.S. at 616-17 n.6 (Souter, J., plurality opinion), and any available subjective evidence of deliberateness, courts will better ensure that law enforcement officers do not circumvent the Fifth Amendment right against self-incrimination through the use of "interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice" about speaking. *Miranda*, 384 U.S. at 464-65.

Once a law enforcement officer has detained a suspect *and subjects him to interrogation* — as was the case in *Seibert* and is the case here — there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed.[14] Instead, the most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness. As Justice Souter explained:

> By any objective measure . . . it is likely that if the interrogators employ the technique of witholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffessive in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble.

---

[14]Justice Kennedy suggested that in some situations, there may be a legitimate reason for not giving a suspect an immediate *Miranda* warning, such as when an officer does not plan to question the suspect or is waiting for a more appropriate time to do so. *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring in the judgment). However, unlike the facts in *Seibert* and this case, those situations assume that the officer has not begun interrogating the suspect.

*Seibert*, 542 U.S. at 613 (Souter, J., plurality opinion). Justice Kennedy agreed: "the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained." *Id.* at 620 (Kennedy, J., concurring in the judgment). Because law enforcement officers generally retain control over the timing of a *Miranda* warning and giving the warning to a custodial suspect imposes only a minimal burden, the officer's deferral of the warning until after a suspect's incriminating response further supports an inference of deliberateness.

**[8]** In sum, when a law enforcement officer interrogates a suspect but does not give a *Miranda* warning until after obtaining a confession or an incriminating statement, a court in deciding whether to suppress a subsequent, postwarning confession must determine whether the warning was deliberately withheld. The court should consider any objective evidence or available expressions of subjective intent suggesting that the officer acted deliberately to undermine and obscure the warning's meaning and effect.

### 2. *Determining Effectiveness*

When an interrogator has deliberately employed the two-step strategy, *Seibert* requires the court then to evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible. *Seibert*, 542 U.S. at 615 (Souter, J., plurality opinion); *id.* at 622 (Kennedy, J., concurring in the judgment). The court must determine, based on objective evidence, whether the midstream warning adequately and effectively apprised the suspect that he had a "genuine choice whether to follow up on [his] earlier admission." *Id.* at 616 (Souter, J., plurality opinion). In its analysis, the court should look both to the objective circumstances the plurality cited as "bear[ing] on whether *Miranda*

warnings delivered midstream could be effective enough to accomplish their object," *id.* at 615 (Souter, J., plurality opinion), and to the curative measures characterized by Justice Kennedy as "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning," *id.* at 622 (Kennedy, J., concurring in the judgment). *See also Stewart*, 388 F.3d at 1091 (explaining that if the two-step interrogation was deliberately used, "then the analysis of the *Seibert* plurality and Justice Kennedy's concurrence merge, requiring an inquiry into the sufficiency of the break in time and circumstances between the unwarned and warned confessions").

Thus, the court must address (1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken. *See Seibert*, 542 U.S. at 615 (Souter, J., plurality opinion); *id.* at 622 (Kennedy, J., concurring in the judgment). Notably, both the plurality and Justice Kennedy found significant that in giving Seibert her *Miranda* warning, "the police did not advise that her prior statement could not be used." *Id.* at 616 (Souter, J., plurality opinion); *id.* at 622 (Kennedy, J., concurring in the judgment) (noting that an additional warning that explains the inadmissibility of the prewarning statement would serve as a curative measure).[15] Justice Kennedy also found particularly troubling the overlapping content of the officers' pre- and postwarning questions: "[r]eference to the prewarning statement [during the postwarning questioning] was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating. The

---

[15]The plurality, however, noted that including such a cautionary statement would not, on its own, necessarily cure the defects of the question-first procedure. *Seibert*, 542 U.S. at 617 n.7 (Souter, J., plurality opinion).

implicit suggestion was false." *Id.* at 621 (Kennedy, J., concurring in the judgment). Finally, Justice Kennedy viewed the continuous nature of the interrogation relevant to the suspect's experience of interrogation, suggesting — again, as a curative measure — that a "substantial break in time and circumstances" between pre- and postwarning questioning, would "in most circumstances, . . . allow[ ] the accused to distinguish the two contexts and appreciate that the interrogation ha[d] taken a new turn." *Id*. at 622.

[9] On the other hand, where the court finds deliberateness to be absent, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." *Id.* at 622 (Kennedy, J., concurring in the judgment).

### 3.    Seibert's *effect on relevant precedent*

[10] *Seibert* diminishes *Elstad* but does not destroy it. We conclude, however, that *Orso* cannot stand as the law of the circuit in light of *Seibert*. Under *Orso*, regardless of the police tactics employed, voluntary postwarning inculpatory statements are excluded *only* when the prewarning statements were not only unwarned but also involuntary, and any taint therefrom had not dissipated by the time the *Miranda* warning was given. *Orso*, 266 F.3d at 1039. However, a majority of the Justices in *Seibert* would bar postwarning confessions elicited during deliberate and unremedied two-step interrogations, even if they were given after voluntary unwarned statements.

[11] This holding abrogates *Orso*, because it indicates that there are some "improper tactics," short of coercion, that taint a two-step confession. *See Orso*, 266 F.3d at 1036 (rejecting petitioner's contention that confession was inadmissible because it was obtained by "improper tactics"). Because a majority of the Court has held that in some category of cases involving voluntary prewarning statements, police conduct may nonetheless render *Miranda* warnings ineffective, we

cannot simply revert to our prior law. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (holding that when a three-judge panel is faced with intervening precedent from a higher court that is "clearly irreconcilable" with a prior holding of this court, the panel is bound by the intervening authority).

D.

**[12]** Because the district court did not have the benefit of *Seibert*, it did not make the requisite factual inquiries to determine whether Agents O'Neil and Dobbs deliberately employed the two-step interrogation, and if so, whether the midstream warning effectively apprised Williams of his rights. Without this targeted factual analysis, we cannot be certain that Williams' postwarning statement was properly admitted as evidence. Although the evidence strongly suggests that the midstream warning did not "function 'effectively' as *Miranda* requires," *Seibert*, 542 U.S. at 611-12 (Souter, J., plurality opinion), we are unable to determine on the record before us whether the two-step strategy was used deliberately to undermine *Miranda* (and therefore whether *Seibert's* objective inquiry into effectiveness applies). We therefore reverse the district court's order denying suppression of Williams' postwarning confession, vacate the judgment of conviction and remand for the district court to hold a new suppression hearing consistent with this opinion. The district court shall determine, based on objective as well as any available subjective evidence, whether the two-step interrogation was deliberately used to circumvent *Miranda*, and if so, whether objective evidence demonstrates that the midstream warning failed to apprise Williams effectively of his rights, thereby requiring suppression of the postwarning confession.[16] If the district court finds that the confession must be suppressed, Williams' conviction cannot stand.

---

[16]The objective inquiries into deliberateness and effectiveness function practically as an analysis of whether the facts of a particular case more

IV.

The government argues that even if the district court erred in denying suppression, we should uphold Williams' conviction because any erroneous admission of Williams' written confession was harmless. "On direct review, the government's commission of a constitutional error requires reversal of a conviction unless the government proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *United States v. Garibay*, 143 F.3d 534, 539 (9th Cir. 1998) (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). Any error in this case was not harmless beyond a reasonable doubt.[17]

Erroneous admission of a confession does not constitute structural error. *See Arizona v. Fulminante*, 499 U.S. 279, 306-12 (1991). The Supreme Court has, however, acknowledged that:

---

closely resemble those in *Seibert* or *Elstad*. Although we leave this analysis for the district court, several facts should guide its inquiries. For example, Williams was in custody from the point at which Agents O'Neil and Dobbs took him into the old reception area and began questioning him. Before giving the *Miranda* warning, Agent O'Neil questioned Williams using standard interrogation techniques and until he obtained a confession; then, without any break in time or change of venue, he read Williams his *Miranda* rights and asked Williams to write down what he had already told them. Finally, the court should determine whether the agents took any curative measures "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

[17]Assuming Williams' postwarning confession was improperly admitted, we would also conclude under the standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), that the written confession "likely had a substantial and injurious impact on the verdict." *Sims v. Brown*, 425 F.3d 560, 570 (9th Cir. 2005) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1016 (9th Cir. 2004). Unlike in *Sims*, the evidence of Williams' guilt is not so "overwhelming" as to preclude the "reasonable likelihood that the challenged statement[ ] actually prejudiced him." *Id.* at 571.

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . . Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

*Id.* at 296 (quoting *Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J., dissenting)). In *Fulminante*, the Court distinguished between two types of erroneously admitted confessions — those that "concern isolated aspects of the crime or may be incriminating only when linked to other evidence" and "full confession[s] in which the defendant discloses the motive for and means of the crime." *Id.* The latter, the Court explained, will seldom be harmless because they "may tempt the jury to rely upon that evidence alone in reaching its decision." *Id.*

**[13]** Our case law tracks this distinction. We have held erroneous admission of inculpatory statements harmless under the *Chapman* standard only where the confession did not go to the heart of the case. *See, e.g.*, *Garibay*, 143 F.3d at 539-40 (holding admission not harmless where defendant's statements "were the thrust of the prosecution's case"); *United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994) (reversing conviction where district court erroneously admitted defendant's statement that provided a detailed account of the crimes charged); *cf. United States v. Padilla*, 387 F.3d 1087, 1093-94 (9th Cir. 2004) (holding error harmless where "[t]he only usefulness of the statement was that it was inconsistent with the defense Padilla put on"). Williams' full confession went to the heart of his case.

**[14]** Additionally, contrary to the government's assertion, we cannot be certain on the record before us that the jury would have pieced together the other evidence presented by the government and reached a guilty verdict. In addition to the

confession, the government submitted Williams' application, which listed Williams' height as 5' 8" (a height between Williams' actual height and Iddrissu's), the testimony of a clerk that he showed Williams his application with Iddrissu's photographs attached and Williams' testimony that plans for the trip to London, mentioned in the application, had not been finalized. This evidence clearly supported the government's argument that Williams intended to obtain a passport for Iddrissu. But Williams also presented contrary evidence to the jury. He testified that the photographs must have been switched inadvertently, or, in the alternative, that Iddrissu must have intentionally switched the photographs without telling Williams. In the absence of the confession, it is not clear that the jury would have credited the government's story over Williams' version. As we cannot be certain "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," and in light of the Court's guidance in *Fulminante*, we hold that the admission of Williams' written confession, if erroneous, was not harmless. *Chapman*, 386 U.S. at 24.

## V.

[15] We **REVERSE** the district court's order denying suppression, **VACATE** the judgment of conviction and **REMAND** the case to the district court for further proceedings consistent with this opinion.