LIU, J., Dissenting.
The nine separate opinions offered by this court in the three confrontation clause cases decided today reflect the muddled state of current doctrine concerning the Sixth Amendment right of criminal defendants to confront the state’s witnesses against them. The United States Supreme Court’s most recent decision in this area produced no authoritative guidance beyond the result reached on the particular facts of that case. (See Williams v. Illinois (2012) 567 U.S._ [183 L.Ed.2d 89, 132 S.Ct. 2221] (Williams).) Given the array of possible doctrinal approaches left open by Williams, one can only surmise that the high court will soon weigh in again.
In the meantime, it is incumbent upon this court to analyze Williams together with precedents that remain binding on us to identify, as best as we can, the governing principles in this evolving area of law. In discharging that obligation, today’s opinion articulates a two-part definition of testimonial hearsay. “First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity.” (Maj. opn., ante, at p. 581.) “Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution . . . .” (Id. at p. 582.) These statements are true as far as they go. But they offer little guidance to lower courts and litigants who must confront these issues day in and day out.
In this case, the court rests its holding on the sole ground that the out-of-court statements at issue lacked sufficient indicia of formality to *591 trigger defendant’s confrontation clause right. But the Supreme Court has never relied solely on a statement’s lack of formality to deny a defendant’s right to confront witnesses against him. Although the court today succeeds in reaching a majority holding, its reasoning does little to help clarify this difficult area of law.
The high court’s precedents offer us more than this. A careful reading of the case law, beginning with Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford), suggests that the level of formality of a statement, while relevant, does not exhaust the proper analysis for adjudicating a claim under the confrontation clause. In this case, I would conclude that the laboratory analyst’s out-of-court statements concerning the source and conduct of blood-alcohol testing qualify as testimonial under the Sixth Amendment based on the process and purpose that gave rise to those statements. Because the statements were offered through the testimony of a surrogate analyst without personal knowledge of the underlying facts, defendant was denied her right to confront the state’s witnesses against her.
I.
As an initial matter, I address the proper interpretation of the high court’s decision in Williams. “ ‘When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, “the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds ....”’ (Marks v. United States (1977) 430 U.S. 188, 193 [51 L.E.2d 260, 97 S.Ct. 990].)” (Del Monte v. Wilson (1992) 1 Cal.4th 1009, 1023 [4 Cal.Rptr.2d 826, 824 P.2d 632].) As the Ninth Circuit has explained, “We need not find a legal opinion which a majority joined, but merely ‘a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree.’ ” (U.S. v. Williams (9th Cir. 2006) 435 F.3d 1148, 1157.) “This rule only works in instances where ‘one opinion can meaningfully be regarded as “narrower” than another—only when one opinion is a logical subset of other, broader opinions,’ [King v. Palmer (D.C. Cir. 1991) 292 U.S. App.D.C. 362 [950 F.2d 771, 781] (en banc)], that is to say, only when that narrow opinion is the common denominator representing the position approved by at least five justices. When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court.” (U.S. v. Alcan Aluminum Corp. (2d Cir. 2003) 315 F.3d 179, 189 (Alcan).) “The only binding aspect of such a splintered decision is its specific result. . . .” (Ibid.)
*592 No published lower court decision, state or federal, that has examined Williams has identified a single standard or common denominator commanding the support of a five-justice majority. I, too, conclude that Williams is an example of a decision where the only binding aspect is its specific result. (See State v. Deadwiller (2012) 2012 WIApp 89 [820 N.W.2d 149, 153] [“We are bound in this case by the judgment in Williams, and the narrowest holding agreed-to by a majority (albeit with different rationales) is that the Illinois DNA technician’s reliance on the outside laboratory’s report did not violate Williams’s right to confrontation because the report was not ‘testimonial’ and therefore did not implicate the Confrontation Clause.”].)
Writing for a four-justice plurality, Justice Alito found that the witness’s testimony about Cellmark’s out-of-court statements concerning the source of the DNA sample and the lab’s methodology were offered not for their truth but rather to explain the assumptions upon which the prosecution expert’s opinion rested. (Williams, supra, 567 U.S. at p._ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Justice Thomas and the four dissenting justices rejected this argument. (See id. at p._[132 S.Ct. at p. 2256] (cone. opn. of Thomas, J.) [“there was no plausible reason for the introduction of Cellmark’s statements other than to establish their truth”]; id. at p._[132 S.Ct. at p. 2268] (dis. opn. of Kagan, J.).) The plurality also reasoned that the statements were not testimonial because they were not made with “the primary purpose of accusing a targeted individual of engaging in criminal conduct.” (Id. at p._[132 S.Ct. at p. 2242] (plur. opn. of Alito, J.).) This rationale was also rejected by the other five justices. (Id. at p._[132 S.Ct. at p. 2262] (cone. opn. of Thomas, J.) [“[The plurality’s] test lacks any grounding in constitutional text, in history, or in logic.”]; id. at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.) [“Where that test comes from is anyone’s guess.”].) As Justice Kagan observed, Justice Alito’s opinion is called “ ‘the plurality,’ because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication.” (Id. at p._[132 S.Ct. at p. 2265] (dis. opn. of Kagan, J.).)
Justice Thomas concurred only in the result reached by the plurality, adhering to his long-held view that the “. . . Confrontation Clause regulates only the use of statements bearing ‘indicia of solemnity.’ ” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2259] (cone. opn. of Thomas, J.).) By that test alone, Justice Thomas concluded that Cellmark’s report was not testimonial because it “lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact.” (Id. at p._[132 S.Ct. at p. 2260] (cone. opn. of Thomas, J.).) Although this sharp focus on the formality of the statement might suggest that it is the narrowest ground on which the Williams decision rests, that is not the case. The plurality opinion observed that “formalized statements such as affidavits, depositions, prior *593 testimony, or confessions” were among the characteristics shared by the abuses which prompted the adoption of the confrontation clause. (Williams, at p._[132 S.Ct. at p. 2242] (plur. opn. of Alito, J.).) But the plurality did not otherwise examine or rely on the degree of formality of the statements at issue. Thus, Justice Thomas’s opinion cannot be “meaningfully regarded as ‘narrower’ than” the plurality opinion because it is not a “logical subset” of the plurality opinion. (King v. Palmer, supra, 950 F.2d at p. 781.)
It is a mistake to contend, as Justice Chin does in his concurring opinion today in People v. Dungo (2012) 55 Cal.4th 608, 612-613 (cone. opn. of Chin, J.), that we should resolve confrontation clause cases by determining what result would gamer the votes of the five justices who supported the outcome in Williams. That approach—cobbling together the nonoverlapping rationales put forward by Justice Alito and Justice Thomas in Williams—does not identify “a single standard” or “common denominator” on which five justices of the high court agree. (Alcan, supra, 315 F.3d at p. 189.)
Likewise, the court in this case errs in rejecting defendant’s reliance on Justice Kagan’s opinion in Williams simply because it is labeled a dissent. (Maj. opn., ante, at p. 585.) As with the labeling of Justice Alito’s opinion as “the plurality,” Justice Kagan’s opinion is labeled a “dissent” only by convention. The fact that Justice Alito’s and Justice Thomas’s opinions support the result in Williams does not mean that Justice Kagan’s opinion is a dead letter in this area of doctrine. In the future, Justice Thomas’s and Justice Kagan’s positions might result in a five-justice majority for a particular result, as in cases like Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305 [174 L.Ed.2d 314, 129 S.Ct. 2527] (Melendez-Diaz) and Bullcoming v. New Mexico (2011) 564 U.S._[180 L.Ed.2d 610, 131 S.Ct. 2705] (Bullcoming), where the out-of-court statement was sufficiently formal to meet Justice Thomas’s standard and the primary purpose was evidentiary. Likewise, Justice Alito’s and Justice Kagan’s positions might result in a majority for a particular result in cases where the'evidence does not meet Justice Thomas’s standard of formality but is otherwise sufficiently formal and accusatory to be considered testimonial under Justice Alito’s standard. In such a case, Marks analysis might make Justice Alito’s standard binding as to that category of cases. (See Marks v. United States, supra, 430 U.S. 188.) But that result would still leave open the proper standard for cases where the contested statement does not satisfy Justice Alito’s standard but does satisfy Justice Kagan’s.
As this discussion illustrates, it is easy enough to count noses and determine what the outcome would be if we were to apply the various opinions in Williams to alternative fact patterns. But such nose-counting is an exercise for litigators, not jurists. As a court tasked with applying an evolving line of jurisprudence, our role is not simply to determine what outcome will likely *594 gamer five votes on the high court. Our job is to render the best interpretation of the law in light of the legal texts and authorities binding on us.
II.
Turning to the case at hand, I agree with the court’s basic conclusion that the United States Supreme Court’s approach to distinguishing testimonial from nontestimonial statements for purposes of the confrontation clause has something to do with formality and something to do with whether the statement’s primary purpose relates to a criminal prosecution. (Maj. opn., ante, at pp. 581-582.) But the court rests its holding on a single factor—the lack of formality with which the out-of-court statement was memorialized— that the high court has never held to be dispositive despite numerous entreaties by Justice Thomas to his colleagues over the past two decades. (See White v. Illinois (1992) 502 U.S. 346, 365 [116 L.Ed.2d 848, 112 S.Ct. 736] (conc. & dis. opn. of Thomas, J.); Davis v. Washington (2006) 547 U.S. 813, 836-837 [165 L.Ed.2d 224, 126 S.Ct. 2266] (conc. & dis. opn. of Thomas, J.) (Davis); Michigan v. Bryant (2011) 562 U.S._, - [179 L.Ed.2d 93, 131 S.Ct. 1143, 1167-1168] (conc. opn. of Thomas, J.) (Bryant); Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2255] (cone. opn. of Thomas, J.).) Although formality can bring a statement or document into the “ ‘core class of testimonial statements’ ” covered by the confrontation clause (Melendez-Diaz, supra, 557 U.S. at p. 310), no high court decision has found that lack of formality is alone sufficient to render a statement nontestimonial. The cases routinely consider the context in which the statement was made and the purpose for which it was rendered.
The high court’s decisions have not made clear how much formality is required to render a statement testimonial. Justice Thomas, who cast the swing vote in Williams, has focused on the ultimate format of the statement (e.g., notarized, certified, sworn, etc.) rather than the forum or process through which it was generated. (But cf. Davis, supra, 547 U.S. at pp. 836-837 (conc. & dis. opn. of Thomas, J.) [“Affidavits, depositions, and prior testimony are, by their very nature, taken through a formalized process.”].) But a careful reading of the Supreme Court’s decisions suggests that the proper determination of a statement’s formality for purposes of the confrontation clause is closely intertwined with the nature and purpose of the process that produced the statement.
As Justice Scalia has explained, “the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused. It was these practices that the Crown deployed in notorious treason cases like Raleigh’s; that the Marian statutes invited; that *595 English law’s assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind.” (Crawford, supra, 541 U.S. at p. 50.) From this statement, we see an emphasis not on the format of the statement, but on the process through which it was generated—ex parte examinations by the state outside of the defendant’s presence.
Crawford went on to say that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.” (Crawford, supra, 541 U.S. at p. 51.) While this reference to a “type” of statement could be read to pertain to the statement’s format, the high court paid special attention to processes driven by government officers: “That interrogators [today] are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function. . . . The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.” (Id. at p. 53, citations omitted.) Crawford explained that focusing on government involvement in the production of evidence serves as a check on prosecutorial abuse. (Id. at p. 56, fn. 7 [“Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar.”].)
The importance of process to the determination of a statement’s formality is perhaps most apparent from the reasoning and results in Davis. There, the high court said: “Most of the American cases applying the Confrontation Clause or its state constitutional or common-law counterparts involved testimonial statements of the most formal sort—sworn testimony in prior judicial proceedings or formal depositions under oath—which invites the argument that the scope of the Clause is limited to that very formal category. But the English cases that were the progenitors of the Confrontation Clause did not limit the exclusionary rule to prior court testimony and formal depositions, [citation]. In any event, we do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman recite the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition. Indeed, if there is one point for which no case—English or early American, state or federal—can be cited, that is it.” (Davis, supra, 547 U.S. at pp. 825-826.)
*596 In Davis, the high court resolved two cases, each involving a contested out-of-court statement. One was a 911 call made by a woman reporting an ongoing assault. In response to questions from the 911 operator, the woman made a series of statements that were recorded and later played for the jury. (Davis, supra, 547 U.S. at pp. 817-819.) Because the recording of the 911 call was admitted into evidence, it seems fair to assume that the prosecution established some foundation for doing so, including an attestation that the recording was accurate and involved the incident in question. But the high court made no mention of any formalities in how the 911 call was memorialized. Instead, the court compared the 911 call with the out-of-court statements at issue in Crawford and observed that “the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; [here, the defendant’s] frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.” (Davis, at p. 827.) The high court took note of this relative lack of formality in the context of a broader discussion establishing that “the elicited statements [in the 911 call] were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past.” (Davis, at p. 827.) These contextual considerations led the high court to conclude that the “primary purpose” of eliciting the statements on the 911 call “was to enable police assistance to meet an ongoing emergency. [The declarant] simply was not acting as a witness, she was not testifying.” (Id. at p. 828.)
The other out-of-court statement considered in Davis was a police interview conducted with a battery victim in her home after officers responded to a “reported domestic disturbance.” (Davis, supra, 547 U.S. at pp. 819-820.) The substance of the police interview was recounted through the testimony of one of the responding officers. (Id. at p. 820.) Although the declarant’s oral statements were not recorded, sworn, or attested to in any formal manner, the high court found the circumstances in which the statements were given to be sufficiently formal to qualify as testimonial; “It is true that the Crawford interrogation was more formal. It followed a Miranda warning, was tape-recorded, and took place at the station house [citation]. While these features certainly strengthened the statements’ testimonial aspect—made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events—none was essential to the point. It was formal enough that [the declarant’s] interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his ‘investigat[ion].’ [Citation.] What we called the ‘striking resemblance’ of the Crawford statement to civil-law ex parte examinations, [citation], is shared by [the declarant’s] statement here. *597 Both declarants were actively separated from the defendant .... Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial.” (Davis, at p. 830.) As these passages from Davis make clear, the high court focused on the process by which an out-of-court statement was generated, not the ultimate format of the resulting statement.
We applied Davis in People v. Cage (2007) 40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205] (Cage) to find that an unsworn statement given to police by an assault victim awaiting treatment in an emergency qualified as testimonial. Regarding the statement’s formality, we observed: “The circumstances of this interview, in a hospital emergency room, were relatively informal, but they were no less formal or structured than the residential interview of [the declarant] in Davis. Here, as there, the requisite solemnity was imparted by the potentially criminal consequences of lying to a peace officer.” (Cage, at p. 986, fn. omitted.) Nor was the interview in Cage “insufficiently ‘structured’ to constitute an ‘interrogation’ ” simply because the record mentioned only a single question posed by the officer to the victim. (Id. at p. 986, fn. 16.) Instead, we observed that “single question . . . called for, and elicited, a considered and detailed narrative response” analogous to the statement in Davis. (Cage, at p. 986, fn. 16.) The fact that the statement was neither tape-recorded nor memorialized as an affidavit or other sworn statement did not negate the formality imparted by the circumstances in which it was rendered.
Four years later, in Bryant, the high court again made clear that lack of formality is not dispositive of whether a statement is testimonial. “Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to ‘establish or prove past events potentially relevant to later criminal prosecution,’ [citation], informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent.” (Bryant, supra, 562 U.S. at p._[131 S.Ct. at p. 1160].) Although the out-of-court statement at issue in Bryant was not memorialized or recorded in any formal way, the high court’s analysis did not focus on those features. Instead, it focused on the “informality of the circumstances” in which the statement was made to find that it was not testimonial: “[T]he questioning in this case occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion. All of those facts make this case distinguishable from the formal station-house interrogation in Crawford.” (Bryant, at p._[131 S.Ct. at p. 1160].)
*598 The court today rests its holding solely on the lack of formality with which the statement was memorialized, without regard to the process by which it was created. In so doing, the court takes a step down the road of making constitutional mountains out of factual molehills in a manner that Justice Kagan warned against. (Williams, supra, 567 U.S. at p. __ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.) [focusing on the ultimate format of a lab report “grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause’s protections”].) Had the analyst’s notations here been preceded by the formal heading of “certificate,” or had his signature followed a printed statement that he “attested” to the results, the court would presumably find his report to be testimonial. And that would be correct insofar as such notations would suggest that the document was generated through a process that was primarily concerned with its later use in a criminal prosecution. However, as in Davis and Cage, the absence of such notations tells us nothing definitive about the formality with which the statements were generated. (See Williams, at p. _ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.) [“[A] difference in labeling ... is not of constitutional dimension.”].) Instead, we must look at the process that produced the statements, “taking into account all of the surrounding circumstances” (id. at p._[132 S.Ct. at p. 2243] (plur. opn. of Alito, J.)) in order to discern not only the statements’ “form” but also their “function” and “purpose” (id. at p._[132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.)).
Here, the San Diego County Sheriff’s Regional Crime Laboratory, a state-licensed forensic alcohol laboratory under the control of the San Diego Sheriff’s Department, received a blood sample from the California Highway Patrol for testing. A laboratory assistant, Brian Constantino, prepared the sample for testing. In handwriting on an evidence logsheet, Constantino assigned a lab number to the sample, noted whether or not the sample was sealed upon receipt, and wrote other identifying information about the sample, including the subject’s name, date of birth, requesting agency, the arresting officer’s badge number, type of specimen, date and time of collection, and the type of analysis requested. Later that week, a second analyst, Jorge Peña, prepared the sample and conducted a blood-alcohol analysis by means of a gas chromatograph. When the machine completed its analysis, Peña reviewed and initialed the machine printouts of the results. On the original logsheet, Peña recorded the results of the blood-alcohol analysis performed on the sample, the date of the analysis, and his initials as the person performing the requested analysis.
At trial, the prosecution introduced the evidence logsheet along with five additional pages containing computer printouts with the results of machine calibration conducted by Peña and the results of the analysis Peña performed on the sample. Each of those five pages was signed or initialed by Peña, but otherwise includes no independent statements or attestations by Peña as to the *599 results. All six pages were introduced through the testimony of John Willey, a forensic alcohol supervisor employed by the same lab that conducted the analysis. Willey testified that his title of “forensic alcohol supervisor” was “issued to me by the state of California” along with a certification for that role. (See Cal. Code Regs., tit. 17, §§ 1215.1, subd. (f) [defining “ ‘Forensic Alcohol Supervisor’ ”], 1216.1, subd. (e) [setting forth qualifications for a “forensic alcohol supervisor”].) Willey also testified that “each of the people who works at the lab is trained to process blood alcohol analysis in the same manner” based on standards that were originally established by the state and are now dictated by the sheriff’s crime lab itself in accordance with scientific standards.
I focus here on the evidence logsheet, a single page containing notations by Constantino and Peña. The document, marked “for lab use only,” may look relatively informal. But the context in which it was created was anything but. As Willey testified, the laboratory staff are all trained to analyze blood alcohol “in the same manner” based on standards set by the state and by the lab. He further testified that those procedures are followed in every case. Of course, this type of careful adherence to formal procedures is good practice for the accuracy and validity of the work of any laboratory. But this was a government crime lab, and the notations on the logsheet were produced with at least as much solemnity and government involvement as the structured, tape-recorded, station-house witness interview in Crawford.
Indeed, the highly proceduralized, government-driven character of the blood-alcohol analysis is apparent from the array of regulations governing the licensing of forensic alcohol laboratories by the State Department of Public Health (Department), as well as analyst qualifications, testing procedures, and recordkeeping. (See Cal. Code Regs., tit. 17, §§ 1216 [imposing licensing requirement], 1216.1 [setting forth licensing qualifications], 1216.1, subd. (f) [defining qualifications for a “forensic alcohol analyst”], 1217.7 [authorizing Department to conduct onsite surveys and proficiency tests to ensure accuracy of forensic alcohol analyses], 1219 [“The identity and integrity of the samples shall be maintained through collection to analysis and reporting.”], 1220, subd. (b) [requiring each licensed lab to “have on file with the Department detailed, up-to-date written descriptions of each method it uses for forensic alcohol analysis”], 1222.1 [imposing recordkeeping requirements].) Further, just as the witness statements in Davis and Cage were made under the potential threat of legal sanction for lying to a peace officer, erroneous notations on the logsheet—whether due to inadvertence, incompetence, or willful fabrication—can, at a minimum, cause the crime lab to lose its license or face “disciplinary action” by the Department. (Cal. Code Regs., tit. 17, § 1216.1, subd. (c).) In addition, an analyst who knowingly makes erroneous notations may be subject to criminal sanction. (See, e.g., Pen. Code, §§ 133 [prohibiting fraud, deceit, or knowingly false statements with intent to affect *600 a witness’s testimony], 134 [prohibiting preparation of false documentary evidence], 137 [making it a crime to influence testimony or information given to a law enforcement officer].) In light of these considerations, I conclude that the notations on the logsheet were produced with the kind of government involvement and formality of process that implicate the right protected by the confrontation clause.
III.
I now turn to the second factor in confrontation clause analysis: the primary purpose of the document. As the court observes, “all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement’s primary purpose must be.” (Maj. opn., ante, at p. 582.) According to the plurality in Williams, a testimonial statement is one that has “the primary purpose of accusing a targeted individual of engaging in criminal conduct.” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2242] (plur. opn. of Alito, J.).) Five justices in Williams rejected the plurality’s rule on the ground that it “derives neither from the text nor from the history of the Confrontation Clause” and “has no basis in our precedents.” (Id. at p._[132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.); see id. at p. _ [132 S.Ct. at p. 2262] (cone. opn. of Thomas, J.).) Justice Thomas said that “for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution.” (Id. at p._[132 S.Ct. at p. 2261] (cone. opn. of Thomas, J.).) The four dissenting justices proposed a similar rule, relying on Melendez-Diaz: A statement is testimonial when “made for the primary purpose of establishing ‘past events potentially relevant to later criminal prosecution’—in other words, for the purpose of providing evidence.” (Id. at p._ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.).)
A review of the case law indicates that Justice Kagan’s “evidentiary” primary purpose test is most faithful to the high court’s authoritative pronouncements in prior cases going back to Crawford. In Davis, supra, 547 U.S. at page 822, the high court said that statements in response to police interrogation “are testimonial when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” In Bullcoming, supra, 564 U.S. at page_[131 S.Ct. at p. 2717], the high court said that “[a] document created solely for an ‘evidentiary purpose,’ . . . made in aid of a police investigation, ranks as testimonial.” The same idea is stated in Bryant, supra, 562 U.S. at page_ [131 S.Ct. at p. 1157] (“The existence of an ongoing emergency is relevant to determining the primary purpose of the *601 interrogation because an emergency focuses the participants on something other than ‘proving] past events potentially relevant to later criminal prosecution.’ ”), in Melendez-Diaz, supra, 557 U.S. at pages 310-311 (statements “ ‘ “made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial” ’ ” were testimonial), and in Crawford, supra, 541 U.S. at pages 51-52 (“[v]arious formulations of this core class of ‘testimonial’ statements exist,” including “ ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial’ ”).
Unlike the Williams plurality’s “accusatory” or “inherently inculpatory” test, Justice Kagan’s evidentiary test is also consistent with the text and history of the Sixth Amendment, which guarantees to criminal defendants the right “to be confronted with the witnesses against him.” As the court explained in Melendez-Diaz, “The text of the [Sixth] Amendment contemplates two classes of witnesses—those against the defendant and those in his favor. . . . [T]here is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation.” (Melendez-Diaz, supra, 557 U.S. at pp. 313-314.) Responding to the plurality in Williams, Justice Thomas concluded that “the distinction between those who make ‘inherently inculpatory’ statements and those who make other statements that are merely ‘helpful to the prosecution’ has no foundation in the text of the Amendment.” (Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2263] (cone. opn. of Thomas, J.).) Justice Thomas further noted that the 17th- and 18th-century English law that gave rise to the confrontation clause required magistrates “to take the ex parte examination of a witness even if his evidence was ‘weak’ or the witness was ‘unable to inform any material thing against’ an accused.” (Ibid. (cone. opn. of Thomas, J.); see Crawford, supra, 541 U.S. at pp. 42-50 [discussing the abusive historical practices that resulted in adoption of the confrontation clause].)
While generally agreeing with the “evidentiary” primary purpose test (see People v. Dungo, supra, 55 Cal.4th 608, 644 (dis. opn. of Corrigan, J.)), Justice Corrigan concludes in this case that several of the notations are nontestimonial because they “were simple, nontestimonial business records.” (Cone. opn. of Corrigan, J., ante, at p. 588.) But in Melendez-Diaz, the high court rejected the argument that the analysts’ affidavits in that case were admissible at common law as business records without regard to the confrontation clause: “[T]he affidavits do not qualify as traditional official or business records, and even if they did, their authors would be subject to confrontation nonetheless.” (Melendez-Diaz, supra, 557 U.S. at p. 321, italics added.) While acknowledging that “[documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status,” the high court said “that is not the case if the regularly conducted business *602 activity is the production of evidence for use at trial.” (Ibid.) Justice Corrigan is correct that “[t]his sentence should not be read to mean that if the nature of the business is producing forensic evidence, as in the case of a testing laboratory, none of its records can ever qualify as business records.” (Cone, opn. of Corrigan, J., ante, at p. 588, fn. 2.) Certainly those records maintained by a crime lab solely for the purpose of its internal operations, such as payroll and accounting records, would qualify as nontestimonial business records. A gray area might be presented by lab records maintained solely for purposes of accreditation and licensing (see Cal. Code Regs., tit. 17, § 1222.1), given the state’s obvious interest in the proper operation of forensic labs. But the same cannot be said of records generated in the course of evidence analysis. The record in this case shows that the lab’s evidentiary purpose permeates even the most mundane of activities associated with the tested samples.
As noted, the San Diego crime lab follows strict procedures established internally by the sheriff’s office and by state regulatory law. The active involvement of law enforcement is evident on the face of the logsheet, which contains entries for the requesting agency (here, the California Highway Patrol) and the name and badge number of the subject’s arresting officer. Moreover, in his testimony, Willey specifically mentioned the evidentiary value of the lab’s work in criminal prosecutions as a factor guiding the processes followed by the lab. When asked about the lab’s procedures for handling samples and assigning lab numbers, Willey explained: “When the—when the bag is opened and the numbers are put on it, a sample is picked that’s the best of the two for analysis. We only analyze one sample for everything. That way, it’s—we don’t get into the defense problem that we analyzed one sample and the other one, we analyzed for something else. So everything goes on one sample.” Willey further explained: “Years ago, there was a lot of argument. We would get two samples in. We would send one to toxicology, and we analyzed one for alcohol. Turned out we got a lot of defense arguments, how do we know what was done? How do we know the samples are the same? At that point, the policy and procedure was changed. We keep a duplicate vial in case anything comes up that we need more testing. And we do all of our analysis on one vial.”
Based on Willey’s testimony, it is apparent that from the moment an evidence bag is opened and the analyst selects a vial for testing by assigning it a lab number and recording the number onto the logsheet, the lab’s procedures are driven by potential use of the results as evidence in a criminal prosecution. Thus, the records at issue here, including the analyst’s notations linking defendant to the lab record in question, are testimonial. (See Melendez-Diaz, supra, 557 U.S. at p. 324 [“Whether or not they qualify as business or official records, the analysts’ statements here—prepared specifically for use at petitioner’s trial—were testimony against petitioner, and the *603 analysts were subject to confrontation under the Sixth Amendment.”].) Because the statements were introduced through a surrogate with no personal knowledge of those facts, they were offered in violation of the confrontation clause.
Importantly, the conclusion I reach in this case does not raise the specter of “requiring] in-court testimony from each human link in the chain of custody.” (Melendez-Diaz, supra, 557 U.S. at p. 336 (dis. opn. of Kennedy, J.).) Like the high court in Melendez-Diaz, I would “not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution’s case.” (Id. at p. 311, fn. 1 (maj. opn.).) This is a case about a county crime lab. A crime lab, where a high volume of samples are received, stored, and tested, presents particular risks of mixup or contamination that may not extend to chain of custody issues in other settings. (See id. at pp. 317-321; Metzger, Cheating the Constitution (2006) 59 Vand. L.Rev. 475, 494-495 [recounting systemic problems with crime labs in Maryland, Arizona, Texas, and Florida].)
Justice Werdegar’s desire to establish “fair and practical” boundaries around the confrontation clause is both understandable and salutary. (Cone, opn. of Werdegar, J., ante, at p. 586.) The difficulty, however, is that the arguments in her concurring opinion as to why the notations on the logsheet should not be deemed testimonial have been considered and rejected by the high court. First, Justice Werdegar contends that “the recording of an identifying notation, even in a county crime laboratory, raises none of the risk of fabrication or biased reporting that flows from police or prosecutorial interrogation . . . .” (Ibid.) But the high court in Melendez-Diaz declined to exempt “ ‘neutral scientific testing’ ” from the reach of the confrontation clause on the ground that such testing is not “as neutral or as reliable” as the state suggested. (Melendez-Diaz, supra, 557 U.S. at p. 318.) Citing a National Academy of Sciences study, the high court observed that “ ‘[t]he majority of [laboratories producing forensic evidence] are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency.’ [Citation.] And ‘[b]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.’ [Citation.] A forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution.” (Ibid.) As noted, the crime lab in this case is part of the San Diego County Sheriff’s Department. (See San Diego County Sheriff’s Dept., Regional Crime Laboratory, available online at <http://www.sdsheriff.net/crimelab.html> [as of Oct. 15, 2012].) What the high court said about the test results from the state drug lab *604 in Melendez-Diaz is equally applicable to the notations on the logsheet from the county crime lab here: “Forensic evidence is not uniquely immune from the risk of manipulation.” (.Melendez-Diaz, at p. 318.)
Second, Justice Werdegar says there is no reason “to assume any greater risk of inadvertent error is present in a county crime laboratory than in other businesses or public offices.” (Cone. opn. of Werdegar, J., ante, at p. 587.) But the high court in Melendez-Diaz, noting that “[s]erious deficiencies have been found in the forensic evidence used in criminal trials,” made clear that “[cjonfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well.” (Melendez-Diaz, supra, 557 U.S. at p. 319.) Such incompetence (or fraudulent conduct) may extend not only to the conduct of a particular test and the reporting of its result, but also to the verification of a sample’s identity and integrity. Indeed, the high court in Bullcoming specifically noted that the nontestifying analyst in that case “certified that he received Bullcoming’s blood sample intact with the seal unbroken” and “that he checked to make sure that the forensic report number and the sample number ‘correspónd[ed].’ ” (Bullcoming, supra, 564 U.S._ [131 S.Ct. at p. 2714].) These representations, which conveyed information similar to the notations on the logsheet here, were among the statements the high court deemed testimonial and “meet for cross-examination.” {Ibid.)
Third, Justice Werdegar says “[n]or is much likely to be gained by requiring that in all cases the employee who records a laboratory identification number be called to the stand. Such an employee presumably makes scores or hundreds of such notations annually and is extremely unlikely to recall any particular one.” (Cone. opn. of Werdegar, J., ante, at p. 587.) But the same could have been said about the analysts who prepared the reports at issue in Melendez-Diaz and Bullcoming. The high court in Melendez-Diaz rejected the suggestion that “cross-examination of the analysts would be an empty formalism,” noting that “an analyst’s lack of proper training or deficiency in judgment may be disclosed in cross-examination” and that “there is little reason to believe that confrontation will be useless in testing analysts’ honesty, proficiency, and methodology—the features that are commonly the focus in the cross-examination of experts.” (Melendez-Diaz, supra, 557 U.S. at pp. 319, fn. 6, 320, 321.) Similarly, in Bullcoming, the high court concluded that the analyst’s “live testimony could hardly be typed ‘a hollow formality,’ . . .” observing that “surrogate testimony . . . could not convey what [the analyst] knew or observed about the events his certification concerned . . .” or “expose any lapses or lies on the certifying analyst’s part.” (Bullcoming, supra, 564 U.S. at pp. - [131 S.Ct. at pp. 2715-2716].) Moreover, apart from whether an analyst can provide useful testimony about a particular sample, “the prospect of confrontation will deter fraudulent analysis in the first place.” (Melendez-Diaz, at p. 319.)
*605 More fundamentally, whatever plausibility there may be to the contention that “[n]o significant benefit appears that would justify the expense of trial and witness time involved in requiring live witnesses on all such identifying notations” (conc. opn. of Werdegar, L, ante, at p. 587), the high court has made clear that whether or not in-court testimony would produce an incremental gain to reliability is not the proper inquiry here. It is no answer to a confrontation clause claim to say that a laboratory’s standard procedures indicate the trustworthiness of the results or notations. As the high court explained in Crawford and repeated in Melendez-Diaz and Bullcoming: “To be sure, the Clause’s ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . [][] . . . [f] Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.” (Crawford, supra, 541 U.S. at pp. 61-62; see Melendez-Diaz, supra, 557 U.S. at pp. 317-318; Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2715].) To underscore the point, the high court in Melendez-Diaz said the analysts were subject to confrontation even “if all analysts always possessed the scientific acumen of Mme. Curie and the veracity of Mother Teresa.” (Melendez-Diaz, at p. 319, fn. 6; see Bullcoming, 564 U.S. at p. ___ [131 S.Ct. at p. 2715].) Until the high court arrives at an authoritative decision that instructs otherwise, we are bound by the controlling rationale of its established precedents. Those precedents specifically reject alternative guarantees of reliability as proxies for the constitutional right in question. “[Tjhere [may be] other ways—and in some cases better ways—to challenge or verify the results of a forensic test. But the Constitution guarantees one way: confrontation.” (Melendez-Diaz, at p. 318, fn. omitted.)
IV.
The judgment must be reversed unless the prosecution can show beyond a reasonable doubt that the result would have been the same notwithstanding the error. (Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Applying that test here, I conclude that introduction of the evidence logsheet linking defendant to the test sample was prejudicial.
Defendant was charged with vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), a crime that occurs upon commission of vehicular manslaughter while “driving ... in violation of Section 23140, 23152, or 23153 of the Vehicle Code . . . .” The prosecutor may prove intoxication by *606 one of two means: proof that the defendant’s blood-alcohol level was 0.08 percent or greater at the time of the accident (see Veh. Code, § 23152, subd. (b); id., § 23153, subd. (b)) or proof that the defendant was unable to “drive . . . with the caution of a sober person, using ordinary prudence under same or similar circumstances” because of the effects of alcohol (CALCRIM No. 2110). In this case, the prosecution argued both. However, the lab results showing that defendant’s blood-alcohol level was 0.09 percent two hours after the accident were critically important to the prosecution. Based entirely upon that test result, prosecution toxicologist John Treuting testified that defendant’s blood-alcohol level was actually 0.12 percent at the time of the accident. Without that test result, Treuting would have concluded that defendant’s blood-alcohol level was “far lower” based on testimony for the prosecution that she consumed only three shots of tequila. Defendant and defense witnesses testified that she had consumed only two shots of tequila.
Willey purported to offer his own independent analysis of the gas chromatography results. But his testimony had no value without the critical link between defendant’s blood sample and the test results. Because the logsheet provided the only link between defendant and the lab results, and because the lab results were the critical foundation for the prosecution’s evidence that defendant’s blood-alcohol level was 0.08 percent or greater at the time of the accident, the error was not harmless.
Because I find admission of the evidence log to be reversible error, I do not need to address any error that may have arisen from Willey’s testimony conveying the test results themselves to the jury. I find it doubtful, however, that Willey could have arrived at the 0.09 figure through a truly independent analysis of the gas chromatography results, since the blood-alcohol figure is derived from a complex calculation involving integration and regression. If the 0.09 figure is admissible, it must be because the figure is a computer-generated result that, at least as the law stands today, is generally viewed as nontestimonial. (Maj. opn., ante, at p. 583.)
The United States Supreme Court has not decided whether machine-generated results invariably lie beyond the reach of the confrontation clause, and I express no ultimate view on this issue here. I simply note that as a result of ever more powerful technologies, our justice system has increasingly relied on ex parte computerized determinations of critical facts in criminal proceedings—determinations once made by human beings. A crime lab’s reliance on gas chromatography may be a marked improvement over less accurate or more subjective methods of determining blood-alcohol levels. The allure of such technology is its infallibility, its precision, its incorruptibility. *607 But I wonder if that allure should prompt us to remain alert to constitutional concerns, lest we gradually recreate through machines instead of magistrates the civil law mode of ex parte production of evidence that constituted the “principal evil at which the Confrontation Clause was directed.” (Crawford, supra, 541 U.S. at p. 50.)
I would affirm the judgment of the Court of Appeal.