Filed 2/20/14  P. v. Williams CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B244563 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA096709) |
| v. | |
| JOSHUA CLIFFORD WILLIAMS, | |
| Defendant and Appellant. | |

---

APPEAL from a judgment of the Superior Court of Los Angeles County.  Bruce F. Marrs and Steven D. Blades, Judges.  Reversed with directions.

Michael Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Jonathan J. Kline, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Joshua Clifford Williams appeals from the judgment entered following a jury trial in which he was convicted of evading a peace officer by driving in a willful or wanton disregard for the safety of persons or property in violation of Vehicle Code section 2800.2, subdivision (a).

Defendant contends the trial court improperly denied his motion to exclude his statements to a California Highway Patrol (CHP) officer as obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602] (*Miranda*).

We conclude the trial court erred by denying the motion to exclude defendant's first statement, which was the product of custodial interrogation without a *Miranda* advisement. With respect to defendant's second statement, which followed a *Miranda* advisement but was made soon after the original statement, at the same location, and under questioning by the same officer, the trial court did not address or apply *Missouri v. Seibert* (2004) 542 U.S. 600 [124 S.Ct. 2601] (*Seibert*), and did not consider or make any of the findings required under *Seibert*. The record is inadequate for this court to make such findings, were we so inclined. We are thus unable to determine whether defendant's second statement was properly admitted and therefore conditionally reverse the judgment and remand for a new hearing on defendant's motion to exclude his second statement.

Defendant also requests that we review in camera proceedings the trial court conducted after granting his motion for peace officer discovery pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). After reviewing the record, we conclude the trial court did not err in relation to that motion.

## BACKGROUND

About 11:00 p.m. on January 13, 2012, CHP Sergeant Tannon Brown saw a Chrysler and a BMW driving alongside one another on the 60 Freeway near the City of Industry. Brown paced the vehicles for about three-quarters of a mile and determined that both vehicles were going about 98 miles per hour. Brown turned on his patrol car's siren and flashing red, blue, and yellow lights, caught up to the speeding cars, and straddled the lanes so his car was partially behind each of them. Both cars slowed to

2

about 65 miles per hour, but they did not move toward the right. Using his patrol car's loudspeaker, Brown repeatedly told the drivers of the two cars to exit at the next off-ramp. The Chrysler moved toward the right and slowed, but the BMW continued to drive in the second lane at the same speed. Brown moved behind the BMW and turned the siren back on. The BMW began to move toward the right side of the freeway. Brown dropped back behind the Chrysler and, using the loudspeaker, directed the driver of the Chrysler to accelerate to catch up to the BMW. As the distance between Brown's car and the BMW increased, the BMW accelerated and drove away.

Brown chased the BMW at a distance, saw it exit the freeway at about 120 miles per hour, and followed it. After it left the freeway, the BMW traveled through a residential area at speeds between 75 and 100 miles per hour. It also ran a stop sign.

Brown pursued the BMW to a cul-de-sac, where it had stopped before Brown arrived. Brown and his partner approached the BMW with their guns drawn. Brown ordered defendant, who was in the driver's seat of the BMW, to get out of the car with his hands up. Brown searched defendant for weapons and asked defendant what he was thinking. Defendant replied, "'I wasn't. I was scared. I already got two tickets and I can't get another ticket.'"

Brown arrested defendant, handcuffed him, and placed him in the backseat of the CHP patrol car. Brown read defendant his *Miranda* rights and defendant said he understood his rights. Brown asked defendant why he "ran from" Brown. Defendant reiterated that he was scared, he had two prior tickets, and he could not get another ticket. Defendant also said he was not sure whether Brown was pulling over defendant's car or the Chrysler, so he continued driving, but started to pull over when Brown pulled in directly behind him. Defendant stated he knew that it was a CHP car behind him and knew he was supposed to pull to the side when he saw red lights from an emergency vehicle behind him. After Brown stated that defendant had exited the freeway at over 100 miles an hour, he asked defendant how fast he was going when he exited the freeway. Defendant said, "'I don't know. A hundred.'" Upon further questioning,

3

defendant said he thought he was going 80 or 90 miles per hour down the street with the stop sign and that he drove into the cul-de-sac "'to hide'" from Brown.

Defendant's friend Ebimobowei Dick testified that he was defendant's front-seat passenger when defendant was arrested for the charged offense. The people in defendant's car and the people in the Chrysler were on their way to a club together. A "police" car got behind the Chrysler and defendant pulled to the right, but the police car "slowed all the way down" and remained behind the Chrysler. Dick testified, "[W]e didn't know who he was pulling over. So we tried to pull over and he didn't pull over with us. And . . . we just continued to drive like we didn't get pulled over." Dick did not hear any announcement over a loudspeaker by the police officer. Defendant drove on, but they wanted to see if their companions in the Chrysler were okay, so they got off the freeway, intending to get back on going the opposite direction. Dick did not know that the police car was pursing them and defendant said nothing about trying to get away from the officer. Defendant made a wrong turn and the police car came upon them "out of nowhere" in the cul-de-sac. Dick thought defendant was driving about 35 miles per hour when he got off the freeway.

The jury convicted defendant of evading a peace officer in violation of Vehicle Code section 2800.2, subdivision (a). Defendant admitted two allegations that he had served prior prison terms within the scope of Penal Code section 667.5, subdivision (b).[1] The trial court sentenced defendant to an aggregate term of four years in prison.

### DISCUSSION

1.    **Denial of defendant's *Miranda* motion**

Before trial, defendant sought to exclude both the statement he made to Brown before Brown advised him of his rights pursuant to *Miranda* and the statements he made after Brown read him the *Miranda* advisement. Judge Marrs conducted an evidentiary hearing, then denied the motion.

---

[1] Undesignated statutory references are to the Penal Code.

4

Defendant contends the trial court erred by denying his motion because his initial statement was made without *Miranda* warnings and in response to custodial interrogation, and his subsequent postwarning statement was tainted by the initial *Miranda* violation.

**a.      Evidence presented at hearing on *Miranda* motion**

Brown testified that he observed defendant speeding on the freeway, then detained him on Fernfield Drive in Montebello.  Brown and his partner, Jeff Beam, approached defendant's car with their guns drawn.  It was "a high-risk felony stop."  Brown ordered defendant to get out of his car and to put his hands on the hood of the CHP car.  While defendant was standing next to the front fender of the CHP car, Brown asked him, "'What were you thinking?'"  Defendant replied, "I wasn't.  I was scared.  I already got two tickets.  I can't get another one.'"  Defendant was not yet in handcuffs, and Brown and Beam were the only two officers present.  Brown's question and defendant's response occurred "immediately after" defendant got out of the BMW.  Brown then handcuffed defendant, placed him in the backseat of the CHP car, and went to speak to the passengers in the BMW.  "[W]ithin just a couple of minutes," Brown returned to the patrol car and advised defendant of his *Miranda* rights.  Defendant said he understood his rights and Brown questioned defendant for about five minutes.  Neither officer displayed a weapon to defendant or made physical contact with defendant during this questioning.

Brown testified that his patrol car was equipped with a video camera and microphones inside and outside the car, but he had reviewed the recording and the exterior microphones were not working.  The recording thus had not captured defendant's unwarned admissions outside the car.  Because Brown turned the recording system off after he spoke to the BMW's passengers, defendant's admissions after receiving *Miranda* warnings were not recorded either.  The trial court reviewed the recording during the evidentiary hearing.

Defendant testified that Brown aimed a gun at him as he got out of his car and complied with Brown's order to stand next to the patrol car.  Brown immediately

handcuffed defendant and made him sit in the back of the patrol car and closed the car door next to defendant. Brown opened a door on the opposite side of the car and asked defendant what he was thinking and a few other questions without having advised him pursuant to *Miranda*. Brown went to talk to the passengers in the BMW, then returned to the patrol car and asked defendant additional questions. Defendant did not answer Brown's questions. Brown then read defendant his *Miranda* rights. Defendant told Brown he understood his rights. Brown asked defendant what he was thinking and defendant said he was not thinking. Defendant testified he also told Brown that he had not run from Brown because Brown was not behind him.

The trial court initially seemed to note that the critical issue was whether defendant was in custody at the time of the unwarned statement, but the court did not make a finding on this issue. Instead, it switched its focus to whether interrogation occurred. The court stated, "The cases all seem to come down to the key being the police officer's subjective intent, and actions not taken to elicit a specific incriminating statement would not qualify as an interrogation. 'What were you thinking' is equivocal. Could have been either one. The totality of the circumstances as testified to by both the defendant and the officer, what thinking? His response was, I didn't do anything— 'didn't do nothing,' to quote the defendant accurately, that comes down to the question of credibility for the jury. And no questions were asked to follow up on 'I didn't do nothing' to the officer at the front fender of the car. And the second time was after *Miranda*. [¶] I'm not going to find a *Miranda* violation of the facts of our case. Under a preponderance of the evidence, the statement I think was voluntary."

b.      **Defendant's factual concession on appeal**

Notwithstanding defendant's testimony at the evidentiary hearing, defendant conceded in his reply brief that collectively the video and testimony at the hearing established that defendant was outside of the patrol car when Brown asked him what he had been thinking and Brown did not put him inside the patrol car for four and one-half minutes after defendant got out of the BMW.

**c.      Legal principles applicable to police interrogation**

**(1)      *Miranda* warnings are required prior to custodial interrogation**

In *Miranda*, *supra*, 384 U.S. 436, the United States Supreme Court held that a person questioned by the police after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Id.* at p. 444.)  Statements obtained in violation of this rule may not be used to establish guilt. (*Ibid*.)

"Custody" in the *Miranda* context includes both actual custody and any situation in which a person's "freedom of action is curtailed to a 'degree associated with formal arrest.'" (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440 [104 S.Ct. 3138] (*Berkemer*).) In making this determination, a court must examine the totality of circumstances— excluding from consideration the officers' subjective views, beliefs, or knowledge, unless communicated to the suspect—to determine whether a reasonable person in the defendant's position would have experienced a restraint on freedom of movement tantamount to a formal arrest.  (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403; *Stansbury v. California* (1994) 511 U.S. 318, 324 [114 S.Ct. 1526].)  No single factor is dispositive, but the following factors are relevant:  the purpose, place, and length of the questioning; the ratio of officers to suspects; the officer's demeanor; restrictions upon the defendant's freedom of movement; the nature of questioning; the defendant's agreement to be interviewed; advisement that the defendant could terminate the questioning; police domination and control of the questioning; whether police informed the defendant he or she was considered a witness or a suspect; and whether the defendant was arrested at the end of the interview.  (*Pilster*, at pp. 1403–1404.)

Generally, an ordinary traffic stop does not create custody for purposes of *Miranda*, even though the stop temporarily curtails the freedom of action of the driver and any passengers.  (*Berkemer*, *supra*, 468 U.S. at pp. 437–439.)  This is because

"detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." (*Id.* at p. 437.) In addition, "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police" because these stops take place in public view and "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." (*Berkemer*, at pp. 438–439.) Nonetheless, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." (*Berkemer*, at p. 440.)

"Interrogation" refers to both express questioning and to any words or actions that the police should know are reasonably likely to elicit an incriminating response from the suspect. (*People v. Mickey* (1991) 54 Cal.3d 612, 648 (*Mickey*).)

The determination of whether defendant was subjected to custodial interrogation is a mixed question of law and fact, predominantly factual. (*Mickey*, *supra*, 54 Cal.3d at p. 649.)

**(2) Standard of review regarding custodial interrogation**

We review independently whether a challenged statement was obtained in violation of *Miranda*. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032–1033 (*Bradford*).) In doing so, we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. (*Id.* at p. 1033.) With respect to conflicting evidence, "'we must accept that version of events which is most favorable to the People, to the extent that it is supported by the record.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 383–384.)

8

**(3)    Effect of "midstream" *Miranda* warning**

Two United States Supreme Court cases have addressed the admissibility of a statement obtained after a *Miranda* warning but preceded by a prior unwarned incriminating statement, also known as a "midstream" warning or advisement.  The general rule is that established by the older of these two cases, *Oregon v. Elstad* (1985) 470 U.S. 298 [105 S.Ct. 1285] (*Elstad*).

In *Elstad*, a suspect made brief, unwarned, incriminating statements to a police officer at his home and was then taken to a police station, where he was advised pursuant to *Miranda*, questioned at length, and gave a more complete confession about 30 minutes after making his original inculpatory comments.  (*Elstad*, *supra*, 470 U.S. at pp. 301–302.)  The court reasoned that, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to a later statement obtained after a *Miranda* advisement.  (*Elstad*, at p. 314.)  Accordingly, the court held, "[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary.  The relevant inquiry is whether, in fact, the second statement was also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.  The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.  We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief.  No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver.  We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."  (*Elstad*, at p. 318, fn. omitted.)

The second Supreme Court case to address "midstream" warnings was *Siebert*, *supra*, 542 U.S. 600. In *Siebert*, the Supreme Court established a limited exception to *Elstad*, applicable to cases where police indulge in a "question first and warn later" policy. *Seibert* involved an admittedly deliberate police policy of withholding a *Miranda* advisement until a suspect had confessed, then advising pursuant to *Miranda*, then repeating the questioning until the suspect reiterated her confession. (*Seibert*, at pp. 605–606.) In the course of the postadvisement interrogation in *Seibert*, the detective repeatedly referred to the defendant's preadvisement statements. (*Id.* at p. 605.)

*Seibert* produced no majority opinion, although five justices agreed that Seibert's postadvisement statement was inadmissible. The plurality opinion, written by Justice Souter, viewed "[t]he threshold issue when interrogators question first and warn later" as "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." (*Seibert*, *supra*, 542 U.S. at pp. 611–612.) The plurality identified "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object:  the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Seibert*, at p. 615.)

Justice Kennedy concurred in the judgment and much of the plurality opinion, but wrote a separate concurring opinion. He disagreed with the plurality as to the application

of its "effectiveness" test: "The plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on 'whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object' given the specific facts of the case. [Citation.] This test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations. [Citation.] In my view, this test cuts too broadly." (*Seibert*, *supra*, 542 U.S. at pp. 621–622.) Justice Kennedy would instead "apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning. [¶] The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. [Citation.] Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. No curative steps were taken in this case, however, so the postwarning statements are inadmissible and the conviction cannot stand." (*Seibert*, *supra*, 542 U.S. at p. 622.)

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (*Marks v. United States* (1977) 430 U.S. 188, 193 [97 S.Ct. 990].) In the context of *Seibert*, Justice Kennedy's opinion presents the narrowest ground of

11

concurrence.  (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370 (*Camino*); *People v. Rios* (2009) 179 Cal.App.4th 491, 505; *U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157–1158 (*Williams*) and cases cited therein.)  Therefore, *Seibert* applies only where police *deliberately* applied a two-step interrogation technique in which they "question first and warn later" after obtaining an incriminating statement; otherwise, *Elstad* applies.  (*Williams*, at p. 1158.)

Justice Kennedy's opinion did not suggest a standard for determining whether police had deliberately employed a two-step interrogation strategy, but the Ninth Circuit in *Williams* synthesized matters cited in Justice Souter's plurality opinion in *Seibert*, *supra*, 542 U.S. at pages 615–616, to hold, "Consistent with our sister circuits, . . . that in determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning.  [Citations.]  Such objective evidence would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements."  (*Williams*, *supra*, 435 F.3d at pp. 1158–1159, fn. omitted.)

If a court assessing the admissibility of a statement obtained after a midstream *Miranda* advisement determines that the police did not deliberately employ a two-step interrogation strategy, *Elstad* applies.  (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).)  If, however, the court concludes that police deliberately used a two-step interrogation strategy, the court must move on to assess whether the midstream *Miranda* advisement was effective to "advise the suspect that he had a real choice about giving an admissible statement at that juncture" and "reasonably convey that he could choose to stop talking even if he had talked earlier."  (*Seibert*, *supra*, 542 U.S. at pp. 611–612, 615 (plur. opn. of Souter, J.); *id.* at p. 622 (conc. opn. of Kennedy, J.); *Williams*, *supra*, 435 F.3d at p. 1160.)

12

In determining the effectiveness of a midstream advisement, the court should consider both the factors identified in the plurality opinion (*Seibert*, *supra*, 542 U.S. at p. 615 (plur. opn. of Souter, J.)) and any "curative measures [] taken before the postwarning statement" as specified by Justice Kennedy's opinion (*id.* at p. 622 (conc. opn. of Kennedy, J.)). As succinctly summarized by *Williams*, the court should consider "(1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken." (*Williams*, *supra*, 435 F.3d at p. 1160.)

In assessing the effectiveness of a midstream *Miranda* advisement, a trial court should also keep in mind that "[b]y any objective measure . . . it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble." (*Seibert*, *supra*, 542 U.S. at p. 613 (plur. opn. of Souter, J.).)

Neither the plurality opinion nor Justice Kennedy's opinion in *Seibert* addressed the burden of proof applicable to the determinations of deliberateness and effectiveness. Because the prosecution bears the burden of demonstrating the admissibility of a confession (*Brown v. Illinois* (1975) 422 U.S. 590, 604 [95 S.Ct. 2254]) and must prove the defendant's *Miranda* waiver and the voluntariness of the confession by a preponderance of the evidence (*Seibert*, *supra*, 542 U.S. at p. 608, fn. 1 (plur. opn. of Souter, J.), we necessarily conclude that the prosecution bears the burden of proof

regarding these two matters, and that the standard is a preponderance of the evidence. Several federal appellate courts have reached the same conclusion with respect to the deliberateness issue. (See, e.g., *U.S. v. Capers* (2d Cir. 2010) 627 F.3d 470, 479–480; *U.S. v. Stewart* (7th Cir. 2008) 536 F.3d 714, 719; *U.S. v. Ollie* (8th Cir. 2006) 442 F.3d 1135, 1142–1143.)

**(4)   Standard of review regarding midstream *Miranda* warning**

Justice Kennedy's opinion also did not address the standard of review applicable to the determinations of deliberateness or effectiveness. In *Camino*, *supra*, 188 Cal.App.4th at page 1372, the court held that a trial court's determination of deliberateness should be deferentially reviewed under the substantial evidence standard. For reasons addressed later in this part of the opinion, we need not determine the appropriate standard of review at this time.

**d.   The trial court erred by denying defendant's motion with respect to his unwarned statement**

**(1)   Defendant was in custody**

The totality of circumstances, including those established by the audio-video recording introduced at the evidentiary hearing, demonstrated that this was not the "ordinary traffic stop" described in *Berkemer*. The recording showed that Brown's patrol car, with its flashing lights and siren activated, was behind both the BMW and the Chrysler. Brown repeatedly told the cars to pull to the shoulder. The Chrysler quickly complied, but the defendant's car did not. Defendant then led Brown on a high-speed chase, on and off the freeway, during which defendant ran a stop sign. Brown had observed the driver of the BMW commit a violation of Vehicle Code section 2800.2, fleeing or attempting to elude a pursuing peace officer by driving in a willful or wanton disregard for the safety of persons or property, which is an offense punishable as a misdemeanor or a felony, not a mere traffic infraction. Brown therefore had probable cause to arrest defendant.

14

Once Brown caught up to the BMW in the cul-de-sac, he knew that defendant was the person who committed that offense and he treated the situation as "a high-risk felony stop." Brown parked his patrol car perpendicular to the BMW, hampering its ability to drive away. Both Brown and his partner emerged from the patrol car with their guns aimed at the people in defendant's car. Brown appears in the video to have been pointing his gun at defendant. Brown ordered defendant to keep his hands in the air and to get out of the car. As defendant repeatedly attempted to reach toward the door handle Brown repeatedly told him to keep his hands in the air, then repeatedly ordered him to get out of the car. All the while, Brown pointed his gun toward defendant. When defendant finally managed to open his car door while keeping his hands in the air, Brown ordered him to approach the patrol car and put his hands on the hood. By doing so, Brown isolated defendant from his passengers and thereby deprived him of the psychological comfort that their presence might have provided to defendant. Brown then ordered defendant to put his hands on the hood of the patrol car. Meanwhile, Brown's partner kept his gun drawn and pointed at the passengers in the BMW.

Under the circumstances, a reasonable person in defendant's position at the time Brown questioned defendant outside the car would not have expected his detention to be merely temporary and brief, followed by a citation and release. He instead would have expected to be arrested for the offense that he had committed in the officers' presence and that had caused the officers to order him out of his car at gunpoint. "[T]he display of a weapon by police officers plainly conveys to a reasonable citizen the message that he is not free to leave; i.e., that his freedom of action is dramatically curtailed." (*People v. Taylor* (1986) 178 Cal.App.3d 217, 229.)

Notably, the outcome of this encounter was an actual arrest, not the mere citation and release anticipated during most traffic stops. Although the stop was on a public street and only two officers participated, the circumstances as a whole created a far more coercive and threatening encounter than that entailed in a normal traffic stop. Nothing in

15

the record indicates that Brown told defendant he was free to leave, that he could terminate questioning, or that he was *not* under arrest or about to be arrested.

Accordingly, we conclude that a reasonable person in defendant's position would interpret the restraint on his freedom of movement as tantamount to a formal arrest. This constituted custody for the purpose of determining whether a *Miranda* advisement was required.

## (2) Brown interrogated defendant

In the trial court and on appeal, the parties recognized that the only real issue was whether defendant was in custody at the time of the questioning. Neither party has argued that the question did not constitute interrogation.

Although Brown theoretically could have intended "what were you thinking" as a rhetorical exclamation, he specifically testified that he "*asked*" defendant this question. In addition, time had passed between the high-speed chase and the questioning as Brown followed defendant to the cul-de-sac, got out of the patrol car, repeatedly ordered defendant to get out of his car, and directed defendant to approach the patrol car. In addition, Brown asked defendant the same question both before and after advising him pursuant to *Miranda*.

Under the circumstances, "what were you thinking" cannot be viewed as anything other than a question intended to elicit a response. Brown either knew or should have known that the question was reasonably likely to elicit an *incriminating* response, such as an admission of one or more elements of the offense of evading an officer or a statement explaining a motive for such evading, perhaps a motive that revealed other grounds for arrest, such as an outstanding warrant or the presence of contraband in the car. "[N]o fine distinction can be made as to the officer's intention when a suspect is subjected to *express questioning*." (*People v. Turner* (1984) 37 Cal.3d 302, 318, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149.)

Accordingly, because defendant's first statement was obtained in violation of *Miranda*, the trial court erred by denying defendant's motion to exclude it. If, however,

16

defendant's second, post-*Miranda* statement was properly admitted, the admission of the unwarned statement at trial would have been harmless beyond a reasonable doubt because the second statement included the same response to Brown's same question, "What were you thinking?" (*People v. Sims* (1993) 5 Cal.4th 405, 447.)

Accordingly, we assess the trial court's ruling admitting the second statement.

**e.     Reversal is required because the trial court failed to apply *Seibert***

It appears that neither the parties nor the trial court considered the applicability of *Seibert*. The trial court failed to make any of the requisite findings regarding deliberateness or effectiveness. We cannot determine from the record either that Brown did not deliberately employ a two-step interrogation strategy or that the midstream *Miranda* advisement was effective to convey to defendant "that he had a real choice about giving an admissible statement at that juncture" and "that he could choose to stop talking" even though he had made earlier admissions to Brown. Accordingly, we cannot be certain that defendant's postadvisement statement was properly admitted at his trial.

Nor can we conclude that the admission of both of defendant's statements was harmless beyond a reasonable doubt. Notably, the Attorney General, who has the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824]), does not argue that any error in admitting defendant's postadvisement statement was harmless. Defendant's statements established that he knew Brown was attempting to stop his car, not just the Chrysler. Given that Brown was chasing two cars and there was no evidence that defendant heard Brown's public address announcements, jurors may have harbored a reasonable doubt whether defendant mistakenly believed, as his passenger testified, that Brown was not attempting to stop the BMW.

Under the circumstances, we cannot determine whether the trial court committed prejudicial error by denying defendant's motion to exclude his second statement. We therefore conditionally reverse the judgment and direct the trial court to conduct a new hearing on defendant's motion to exclude his second statement to Brown as obtained in

17

violation of *Miranda*. If the court concludes the second statement should have been excluded under *Seibert*, as addressed in this opinion, it will order a new trial at which neither of defendant's statements to Brown may be admitted in the prosecution's case-in-chief. If the court concludes the second statement is admissible under *Seibert*, the judgment will be reinstated and defendant may again challenge the ruling on the motion on appeal, if he wishes.

**2.      Review of in camera *Pitchess* proceedings**

Defendant filed a motion seeking discovery of identifying information regarding everyone who filed a complaint or was interviewed in connection with any complaint against Brown and his partner Beam alleging excessive force; aggressive behavior; violence; bias; coercive conduct; fabrication of evidence, probable cause, or charges; false arrest; perjury; illegal search or seizure; dishonesty; writing false or misleading reports; planting evidence; "or other evidence of misconduct amounting to moral turpitude." Judge Blades granted the motion with respect to "acts of dishonesty, falsifying reports, perjury, anything of that nature" by Brown. The court conducted an in camera review of complaints produced by the custodian of records for the CHP. It found no relevant complaints against Brown.

Defendant requests that this court review the record of the in camera proceedings to determine whether the trial court ordered disclosure of all responsive material. We have done so and determine that the trial court made a proper record (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229) and properly exercised its discretion (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220). There were no complaints or adverse actions, of either internal or external origin, in Brown's file and therefore nothing to disclose.

**DISPOSITION**

The judgment is reversed and the cause is remanded for a new hearing on defendant's motion to exclude his second statement to Brown. If the court concludes the second statement should have been excluded under *Missouri v. Seibert* (2004) 542 U.S. 600 [124 S.Ct. 2601], as addressed in this opinion, then a new trial is to be ordered and

18

neither of defendant's statements to Brown may be admitted in the prosecution's case-in-chief.  If the court concludes the second statement is admissible under *Seibert*, the judgment is reinstated.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.